In re the MARRIAGE OF Thomas August FRANCIS and Diana Mora Francis,

Upon the Petition of

Thomas August Francis, Appellant,

and

Diana Mora Francis, Appellee.

No. 88–1188.

Supreme Court of Iowa.

June 14, 1989.

Rehearing Denied July 13, 1989.

Bruce L. Walker of Phelan, Tucker, Boyle & Mullen, Iowa City, for appellant.

C. Peter Hayek of Hayek, Hayek & Holland, Iowa City, for appellee.

NEUMAN, Justice.

This appeal involves the thorny economic issues surrounding what has come to be called the "advanced degree/divorce decree"[1] dissolution of marriage action.

On the day he was admitted to medical school, appellant Thomas Francis proposed marriage to appellee Diana Mora Francis. Like countless couples before them, they pledged to one another their support and commitment to a shared future. Six years and two children later, however, their marriage is at an end. And while Tom stands at the threshold of his career as a physician specializing in family practice, Diana ponders her future from the vantage point of one who has helped support the family through medical school and two years of residency on the modest income generated by her in-home day care business.

The fighting issue, as framed by the trial court and reiterated by the parties on appeal, is this: What compensation, if any, should Diana receive for her contribution to Thomas' increased earning capacity due to his education received during the marriage? For over a decade this court has recognized that a spouse's contribution to that increased earning potential is a factor properly considered in the award of alimony and an equitable division of the parties' assets. *See In re Marriage of Horstmann*, 263 N.W.2d 885, 891 (Iowa 1978). Yet precisely because each dissolution action must be decided on its unique facts and circumstances, no predictable method of valuing that contribution or distributing the fruits of that increased potential has been settled upon.

Here the trial court awarded Diana a $100,000 lump sum property award payable with interest in ten annual installments, along with a three-year rehabilitative alimony award totaling $54,000. On appeal from these judgments, Thomas concedes that Diana is entitled to *something* but challenges the size and nature of the awards on three principal grounds: first, that the court based its $100,000 on the erroneous legal conclusion that a medical education constitutes an asset for the purpose of equitable distribution; second, that the trial court based its award on calculations that were speculative, incomplete, and misleading; and, third, that the record does

[1]. An apt, but somewhat cynical, label derived from one coined by the Wisconsin Supreme Court in *Haugan v. Haugan*, 117 Wis.2d 200, 206, 343 N.W.2d 796, 799–800 (1984).

not support Diana's need for rehabilitative alimony. Additionally, Thomas challenges his obligation to pay $1000 towards Diana's attorney fees and resists the payment of similar fees on appeal.

Our review of this equitable action is, of course, de novo. *In re Marriage of Janssen*, 348 N.W.2d 251, 252 (Iowa 1984). We are persuaded that the trial court neither misapplied legal doctrine nor erroneously misconstrued the evidence so as to compensate Diana far beyond her contribution to the marriage, as Thomas suggests. We conclude, however, that for marriages of short duration which are devoted almost entirely to the educational advancement of one spouse and yield the accumulation of few tangible assets, alimony—rehabilitative, reimbursement, or a combination of the two—rather than an award of property, furnishes a fairer and more logical means of achieving the equity sought under *Horstmann* and its progeny. Accordingly, with some modification, we affirm the trial court.

■ I. Several well settled rules guide our decision. Principal among them is the rule that an advanced degree or professional license *in and of itself* is not an asset for property division purposes. *Janssen*, 348 N.W.2d at 253; *Horstmann*, 263 N.W. 2d at 891; *In re Marriage of Berger*, 431 N.W.2d 387, 388–89 (Iowa App.1988); *In re Marriage of Stewart*, 356 N.W.2d 611, 612 (Iowa App.1984).

Nevertheless, the future earning capacity flowing from an advanced degree or professional license is a factor to be considered in the division of property and the award of alimony. *Janssen*, 348 N.W.2d at 253; *Horstmann*, 263 N.W.2d at 891; *Berger*, 431 N.W.2d at 388–89; *Stewart*, 356 N.W.2d at 612–13; *In re Marriage of Estlund*, 344 N.W.2d 276, 280 (Iowa App. 1983). Insofar as the advanced professional degree creates an expectancy of higher future earnings, the degree may and should be taken into account in calculating that future earning capacity. *Janssen*, 348 N.W.2d at 253–54; *Horstmann*, 263 N.W.

2d at 891; *Berger*, 431 N.W.2d at 388–89; *Stewart*, 356 N.W.2d at 612–13.

Prior Iowa cases have interchangeably used property awards and alimony as means of compensating a nonprofessional spouse for the contribution made to the other spouse's advanced degree or professional license. *Janssen*, 348 N.W.2d at 254 (substantial periodic alimony rather than lump sum property award equitably adjusts parties' finances); *Horstmann*, 263 N.W.2d at 891 (husband's potential for increased earning capacity made possible "with the aid of his wife's efforts" pertinent to both equitable distribution of assets and whether alimony should be awarded); *Stewart*, 356 N.W.2d at 612–13 (enhanced earning capacity factored in issue of alimony but properly rejected when supporting spouse made comparable career advancement during marriage); *Estlund*, 344 N.W. 2d at 280 (wife's contributions, as homemaker and breadwinner, to husband's law degree properly considered upon issue of equitable division of property). These decisions are in harmony with statutes that direct the trial courts to consider such contributions in the awarding of property and spousal support. *See* Iowa Code §§ 598.-21(1)(e), (3)(h) and (j) (1987).

■ It must be remembered, however, that the purposes of property division and alimony are not the same. Property division is based on each partner's right to "a just and equitable share of the property accumulated as the result of their joint efforts." *In re Marriage of Hitchcock*, 309 N.W.2d 432, 437 (Iowa 1981). Alimony, on the other hand, is a stipend to a spouse in lieu of the other spouse's legal obligation for support. *In re Marriage of Wegner*, 434 N.W.2d 397, 398 (Iowa 1988).

Recently, such court-ordered stipends have taken on new forms to accomodate the broad range of functions that alimony may serve. *See* H. Clark, *The Law of Domestic Relations in the United States* 641–44 (2d ed. 1988). The Utah Court of Appeals nicely summarized the need for such flexibility this way:

In [long-term marriages], life patterns have largely been set, the earning poten-

tial of both parties can be predicted with some reliability, and the contributions and sacrafices of the one spouse in enabling the other to attain a degree have been compensated by many years of the comfortable lifestyle which the degree permitted. Traditional alimony analysis works nicely to assure equity in such cases.

In another kind of recurring case, ... where divorce occurs shortly after the degree is obtained, traditional alimony analysis would often work hardship because, while both spouses have modest incomes at the time of divorce, the one is on the threshold of a significant increase in earnings. Moreover, the spouse who sacrificed so the other could attain a degree is precluded from enjoying the anticipated dividends the degree will ordinarily provide. Nonetheless, such a spouse is typically not remote in time from his or her previous education and is otherwise better able to adjust and to acquire comparable skills, given the opportunity and the funding. In such cases, alimony analysis must become more creative to achieve fairness, and an award of "rehabilitative" or "reimbursement" alimony, not terminable upon remarriage, may be appropriate.

*Petersen v. Petersen,* 737 P.2d 237, 242 n. 4 (Utah App.1987) (citing *Haugan v. Haugan,* 117 Wis.2d 200, 343 N.W.2d 796 (1984); *Mahoney v. Mahoney,* 91 N.J. 488, 453 A.2d 527 (1982)).

With these principles in mind, we consider the contentions of the parties.

II. Thomas begins by asserting that the trial court erroneously characterized his medical education and license as marital assets properly subject to equitable division. We find no merit in the contention. The trial court specifically found that the "degree ... obtained by Thomas [is] not property." It then went on to correctly cite *Horstmann, Janssen,* and *Estlund* for the proposition that it is the potential for

increased future earning capacity made possible by Thomas' degree, with Diana's assistance, "that constitutes the asset for distribution by the Court." [2]

██ We are persuaded, however, by Thomas' assertion that alimony, not a property award, is the proper vehicle by which to achieve equity upon the dissolution of this marriage.

As previously stated in this opinion, alimony has traditionally taken the place of support that would have been provided had the marriage continued. A calculation of future earning capacity, in a case like the present one, essentially represents a value placed on the income to be derived from the advanced degree achieved during the marriage. The amount that would have been the student spouse's contribution to the future support of the parties is logically tied, if not wholly determined by, future earning capacity. Thus the court's duty to look at the future earning capacity of the spouses tracks more closely with a concern for loss of anticipated support, reimbursable through alimony, than through division of as-yet-unrealized tangible assets.

The alimony of which we speak is designed to give the "supporting" spouse a stake in the "student" spouse's future earning capacity, in exchange for recognizable contributions to the source of that income—the student's advanced education. As such, it is to be clearly distinguished from "rehabilitative" or "permanent" alimony.

Rehabilitative alimony was conceived as a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting. *See* Krauskopf, *Rehabilitative Alimony: Uses and Abuses of Limited Duration Alimony,* 21 Fam.L.Q. 573, 581 (1988) (hereinafter Krauskopf); Sackett & Munyon, *Alimony: A Retreat from Tra-*

---

**2.** In light of the precedent earlier cited in this opinion, we differ with the court of appeals' recent suggestion in *In re Marriage of Wagner,* 435 N.W.2d 372, 374–76 (Iowa App.1988) that "potential increase in earning capacity is not,

[as distinguished from the degree] in and of itself, the *asset* to which a value is fixed and then divided." (Emphasis added.) We find such a view in direct conflict with *Horstmann,* 263 N.W.2d at 891.

ditional Concepts of Spousal Support, 35 Drake L.Rev. 297, 314 (1985–86) (hereinafter Sackett); see also In re Marriage of Bevers, 326 N.W.2d 896, 900 (Iowa 1982).

■ Because self-sufficiency is the goal of rehabilitative alimony, the duration of such an award may be limited or extended depending on the realistic needs of the economically dependent spouse, tempered by the goal of facilitating the economic independence of the ex-spouses. See Krauskopf, 21 Fam.L.Q. at 582. As in the case of "traditional" alimony, payable for life or so long as a spouse is incapable of self-support, a change in status (e.g., remarriage) may alter the support picture and warrant a modification. See In re Marriage of Shima, 360 N.W.2d 827, 828 (Iowa 1985) (remarriage shifts the burden on recipient to prove extraordinary circumstances requiring continuation of alimony).

■ "Reimbursement" alimony, on the other hand, which is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other, should not be subject to modification or termination until full compensation is achieved. Similar to a property award, but based on future earning capacity rather than a division of tangible assets, it should be fixed at the time of the decree. In recognition of the personal nature of the award and the current tax laws, however, a spouse's obligation to pay reimbursement alimony must terminate upon the recipient's death. See I.R.C. § 71(b)(1)(D) (Tax Reform Act of 1986); cf. Green v. Commissioner, 855 F.2d 289, 294 (6th Cir.1988).

We think the case before us exemplifies the situation calling for an award of reimbursement alimony rather than a property settlement. Not only does such an award bear a closer resemblance to support than a division of assets, alimony carries tax benefits to the payor and assurance to the payee that the award will not be discharged in bankruptcy. See I.R.C. § 215; 11 U.S.C. § 523(a)(5). The trial court's decree must be modified accordingly.

III. Whether classified as a property division or alimony, Thomas objects to the court's award of $100,000 as a "windfall to Diana far in excess of any equitable return on the contributions she made during the marriage." We thus turn to the record to evaluate the size of the award in light of the facts presented.

The parties were legally married in May 1982, but had lived together since the birth of their son, Michael, in November 1980. At the time of their marriage, neither party was employed and neither had significant assets of any kind. Thomas had completed his bachelor's degree and one year of graduate study. Diana had completed all but her thesis and oral examination required for a master's degree in early childhood development. She received that degree in June 1983. The parties' second child, Melissa, was born in March 1984.

From the outset of their marriage, Thomas and Diana agreed that Diana would care for their children and earn income for the family by caring for other people's children in their home. This arrangement continued throughout the marriage except for a brief period shortly after Melissa was born.

Meanwhile, Thomas entered medical school at Southern Illinois University in the fall of 1982. After one year he transferred to the University of Illinois at Springfield where he obtained his medical degree in 1986, graduating in the top twenty-five percent of his class. The family then moved to Iowa City so that Thomas could enroll in the University's three-year residency program for physicians specializing in family practice.

By November 1986, the parties were experiencing marital difficulties. In June 1987, Thomas petitioned for dissolution of marriage. Trial was held in June 1988.

From the date of their marriage through the date of trial, the parties supported themselves on income from a variety of sources. During the summer before medical school began, Thomas worked as a gardener and earned approximately $1200. Diana earned roughly $5000 per year from her in-home day care business. Thomas' parents contributed $11,500 and Diana's mother gave them $12,000. Student loans

accounted for $45,500 over the six-year period.

Once Thomas obtained his medical degree, his earnings went up substantially. In 1986 he earned $8700, while his salary for 1987 was $29,337. At the time of trial, he was earning approximately $3000 per month from a combination of resident's salary and "moonlighting" as an emergency room physician.

The parties strenuously dispute their relative contributions to child rearing and housekeeping tasks throughout the marriage. Thomas claims that he contributed thirty to fifty percent of those services and that Diana should not be credited for child care or homemaking during those hours in which she was caring for other children as well as her own. Diana argues that Thomas' devotion to his medical studies, as demonstrated by his class rank and a successful residency, greatly limited his available time at home.

The district court specifically found Thomas' testimony lacking in credibility with regard to his alleged substantial contribution to the maintenance of the household. It did conclude, however, that Thomas' educational loans, combined with the income he has earned since the parties' separation, has furnished the bulk of the family's financial support. From our review of the record, we discover no reason to differ with these findings.

 The parties' principal argument is over the testimony of Dr. Richard Stevenson, professor of finance and acting treasurer of the University of Iowa. He was engaged by Diana, in his words, "to value the capital that was contributed by Mrs. Francis to the medical education received during the marriage of Dr. Francis." Thomas' counsel objected to the introduction of this testimony on the ground that the expert's analysis placed a value on the degree itself, contrary to the dictates of *Horstmann,*. Thomas renews that contention on appeal. We are convinced, however, that Dr. Stevenson's calculations, and the district court's ultimate award, were based on Diana's contribution to Thomas'

future earning capacity, not the value of Thomas' medical license:

As background for his economic analysis, Dr. Stevenson took into account the facts previously related concerning the age, education, work experience and financial contributions of the parties. To those figures he added the sum of $64,095 for the estimated present value of Diana's homemaker services (at $6.70 per hour) over the six-year period. Adding this sum to her day care earnings, Diana's capital investment in obtaining Thomas' medical education equalled approximately fifty percent of the total capital committed.

Based upon 1987 figures reported in a journal of medical economics that surveys physicians' earnings by speciality and other classifications (such as geography, type of practice, age, experience, etc.), Dr. Stevenson calculated the after-tax present value of Thomas' future income as a family practice physician to be $1,615,735. He then subtracted the sum of $807,206, a figure representing the estimated future income of a male in the 30–34 age bracket with a five-year undergraduate degree. The difference ($808,529) represents the additional income accruing as a result of the medical degree.

Applying a 30/70 capital to labor ratio, Dr. Stevenson then determined that thirty percent of the present value of Thomas' future earnings, or $242,559, is attributable to capital contributed to acquiring the education. He then reduced that figure by one-half to reflect Diana's contribution to "the capital needed to obtain the medical education and to support the family until the divorce was filed." Thus his estimation of Diana's contribution to Thomas' future earning capacity equals $121,279.

The district court recognized that Dr. Stevenson's final figure was based on many assumptions and that his prediction of Thomas' future earnings could not be exact. Moreover, the court noted that the professor did not consider the benefit gained by Diana in her achievement of a master's degree during the marriage. Consequently, "to compensate Diana for her contribution to Thomas' increased future

earning capacity," the court ordered Thomas to pay Diana the sum of $100,000, payable in annual installments of $10,000 each commencing July 1, 1989.

Thomas attacks the trial court's award by challenging virtually every aspect of Dr. Stevenson's calculations. But for his own opinions, however, Thomas offered no evidence to controvert the assumptions upon which the calcuations were based. He certainly did not challenge the estimated annual income projections, reduced to present value. He merely begrudges Diana her contribution to the accumulation of that income.

In *Horstmann*, we approved an award that represented the cost of the education towards an advanced degree. *See Horstmann*, 263 N.W.2d at 891. We noted, however, that other methods could have been used to measure future earning capacity. *Id.* Similar cases have authorized awards representing the value of services, as a percentage of future earning capacity, contributed to the attainment of the degree. *See Wagner*, 435 N.W.2d at 374–76; *Berger*, 431 N.W.2d at 388–90.

We note that other states, while recognizing the need for something akin to the "reimbursement alimony" outlined in division II of this opinion, limit the supporting spouse's compensation to the financial contributions made towards tuition, living expenses and other costs of the education. *See DeLa Rosa v. DeLa Rosa*, 309 N.W.2d 755, 758–59 (Minn.1981); *Hubbard v. Hubbard*, 603 P.2d 747, 750–53 (Okla.1979); *Beeler v. Beeler*, 715 S.W.2d 625, 627 (Tenn.App.1986); *Hoak v. Hoak*, 370 S.E.2d 473, 475–79 (W.Va.1988). Other jurisdictions speak of compensating the supporting spouse through an award of alimony, but not based on the student's future earning capacity. *See In re Marriage of Rubinstein*, 145 Ill.App.3d 31, 40, 99 Ill.Dec. 212, 217, 495 N.E.2d 659, 664 (1986); *VanBussum v. VanBussum*, 728 S.W.2d 538, 539 (Ky.App.1987); *Petersen*, 737 P.2d at 241–43. In keeping with the standard established in *Horstmann*, however, courts in Iowa are not confined to reimbursing supporting spouses solely for the expense of the advanced degree itself.

We find no error in the formula used here to measure Thomas' future earning capacity and Diana's contribution to its attainment. Thomas concedes a willingness to pay Diana $60,000 for her contribution. The trial court's figure of $100,000 finds ample support in the record and we are not persuaded to reduce or overturn it. *See In re Marriage of Wiedemann*, 402 N.W.2d 744, 747–48 (Iowa 1987); *In re Marriage of Bare*, 203 N.W.2d 551, 554 (Iowa 1973); *In re Marriage of Griffin*, 356 N.W.2d 606, 608 (Iowa App.1984).

■ IV. Just prior to trial, Diana learned of a program in St. Louis that would train her in Montessori pre-school theory and thereby enhance her re-entry into the early childhood education field. The program included seven weeks of training at a cost of $1200 followed by a one-year internship and guaranteed placement as a teacher in a Montessori school. The district court found that Diana was in need of support during this training period and that she was entitled to rehabilitative alimony in the sum of $500 per month during the internship and $1000 per month for four years thereafter to become established in her field.

Thomas strongly opposes this additional award, claiming that with her master's degree and her in-home day care experience, Diana is fully able to support herself without further education or training. In fact, Thomas claims, such a generous alimony award would allow Diana "to attain a standard of living greater than that which she experienced during the marriage."

Diana responds by contending that Thomas' attitude toward rehabilitative alimony would "freeze the inequities of the present moment into perpetuity." We find considerable merit in her retort. Diana may have a master's degree, but she has devoted the last six years of her life to raising her own children and caring for three others at the rate of $230 per week. It is not fair to expect that she support herself this way indefinitely, nor is it realistic to assume that she will become imme-

diately marketable in some more lucrative endeavor.

Like the district court, we view the St. Louis Montessori program as a reasonable way of facilitating Diana's re-entry into the work force. In view of the guaranteed placement feature of the program, however, we think one-year's rehabilitative alimony is sufficient and the decree must be modified accordingly.

V. Finally, we address Thomas' contention that he should not be required to contribute towards Diana's attorney fees, at trial or on appeal.

Ordinarily, an award of attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Schissel*, 292 N.W.2d 421, 428 (Iowa 1980). The controlling factor is ability to pay the fees. *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 662–63 (Iowa 1989).

At the time of trial, Diana had monthly earnings of $720; Thomas' were $2068. Thomas, of course, leaves the marriage burdened with a great deal of debt. His first year salary out of residency, however, is anticipated to be at least $50,000. Diana's chosen field, though professionally rewarding, furnishes far less financial security.

Taking these factors into account, we find no abuse of discretion in the trial court's requiring Thomas to pay $1000 towards Diana's attorney fees. In view of the substantial awards of alimony upheld on this appeal, however, we reject Diana's claim for attorney fees on appeal. *See In re Marriage of Dahl*, 418 N.W.2d 358, 361 (Iowa App.1987).

VI. *Summary.* In lieu of the $100,000 judgment entered by the trial court in Diana's favor, we direct that the trial court order Thomas to pay Diana reimbursement alimony of $10,000 per year for a period of ten years commencing July 1, 1989. Interest at the rate of ten percent per annum shall accrue on any payment not made within thirty days of its due date. This alimony judgment shall not be subject to modification but shall terminate in the event of Diana's death.

The district court's order for rehabilitative alimony commencing August 1, 1988, is affirmed as modified by the reduction to one year and increase in amount to $1000 per month. The trial court's judgment for attorney fees is affirmed. Diana's request for attorney fees on appeal is denied. Costs for this action are assessed against the appellant.

AFFIRMED AS MODIFIFED.

All Justices concur except CARTER and ANDREASEN, JJ., who partially dissent.

CARTER, Justice (dissenting in part).

I believe the trial court was correct in concluding that the type of spousal reimbursement which is the primary issue on this appeal has all of the attributes of a property settlement. I would treat it as such rather than characterizing it as alimony.

ANDREASEN, J., joins this partial dissent.