In re the MARRIAGE OF Craig
G. PROBASCO and Ralane
R. Probasco

Upon the Petition of Craig
G. Probasco, Appellee,

and

Concerning Ralane R. Probasco,
Appellant.

No. 01–0645.

Supreme Court of Iowa.

Jan. 22, 2004.

Rehearing Denied March 23, 2004.

Michael E. Ellwanger and Jeffrey D. Garreans of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, L.L.P., Sioux City, for appellee.

Bradford Kollars, Sioux City, and Daniel L. Bray of Bray & Klockau, P.L.C., Iowa City, for appellant.

LAVORATO, Chief Justice.

Ralane R. Probasco appealed the alimony and property division of her dissolution decree. Craig G. Probasco cross-appealed. We transferred the case to the court of appeals which affirmed on the appeal and cross-appeal. We granted Craig's application for further review in which he challenged the court of appeals decision affirming the district court's award of reimbursement alimony.

Because we conclude reimbursement alimony was not warranted in the circumstances of this case, we vacate the court of appeals decision and reverse the district court judgment on this issue. We modify the district court judgment by allowing Ralane to keep as rehabilitative alimony any payment Craig has made on the reimbursement alimony award. We affirm the court of appeals decision and the district court judgment on the remaining issues raised in the appeal. We remand with directions.

## I. Background Facts and Proceedings.

Ralane and Craig met in 1983. At the time both were attending Morningside College. Eventually they developed an intimate relationship, resulting in the birth of their child, Kally, on October 30, 1985. The parties then began living together.

Ralane had a child, Kallen, from a previous marriage. Kallen was three years old when Ralane and Craig began living together. Kallen lived with the parties until they separated. At the time of trial Kallen was attending college in Alabama.

The parties formally married on February 12, 1991. However, for purposes of this action, they stipulated that they have been married since November 1985. Neither party brought property of appreciable value into the marriage.

In May 1986, Craig graduated from college with a Bachelor's degree in business administration. His grade point average was 2.52. Ralane graduated in December 1986 also with a Bachelor's degree in business administration. Her grade point average was 3.71. Neither party contributed to the education of the other, and both intended to pursue careers in business.

Following his graduation, Craig began working for New York Life Insurance Company as a salesperson. Following her graduation, Ralane worked in the home, caring for the children. She also handled all of the household finances and assisted Craig in keeping track of his business with New York Life.

Throughout 1987 and 1988, the parties lived primarily on borrowed money from a number of sources because Craig's income from New York Life was low. Ralane continued to work in the home, caring for the children, handling family finances, and preparing reports for Craig's insurance work.

In 1989, because Craig was without a driver's license, Ralane had to drive Craig to his business appointments. Craig's income that year was $5,118.

It was at this time that the parties thought about opening a restaurant. They

were looking for a family-type restaurant and began considering a Perkins franchise. Craig focused his efforts on the acquisition and development of such a franchise. Ralane worked for the Census Bureau in 1990 and eventually landed a permanent position with Wilson Trailer of Sioux City in January 1991. She also assisted Craig in the evenings on the Perkins franchise project. Because Craig's insurance income was substantially reduced, the family had to rely on Ralane's income over the next four years.

In 1990, Craig's father, Gene, who was an attorney, formed CGP, Inc. to own and operate the "Perkins Family Restaurant" franchise in downtown Sioux City.

On August 22, 1991, Craig and Gene completed an application to corporate Perkins for a franchise. The application stated that Gene would be a shareholder. Gene had to submit a separate application. In that application, Gene stated he had a special interest in helping Craig operate a family restaurant. Gene paid the initial fee of $5000 and had to provide financial information about himself because Craig could not meet the financial requirements to obtain the franchise.

In August 1992, Craig and Gene formed a partnership, known as Probasco Properties, to own the land and building at the downtown location. Gene made an initial loan of $250,000 to Probasco Properties.

Ralane and Craig acquired the downtown property through Sioux City's tax increment financing plan. Later they transferred the real estate to Probasco Properties.

At this point, Craig needed start up capital for CGP, Inc. Ted Waitt, a person of substantial means and chief executive officer of a corporation, came to Craig's rescue. Waitt had substantial financial resources and financial influence with lenders. Waitt contributed $200,000 in return for 40% of the stock in CGP, Inc. Craig received 60% of the stock for his sweat equity in the corporation.

Eventually, CGP paid a $30,000 fee to corporate Perkins for a Perkins franchise that ran for 20 years. Perkins granted CGP, Inc. a license agreement on September 7, 1993, and on that day, CGP, Inc. opened for business at the downtown location. Without Waitt's investment and influence, CGP, Inc. would not have been able to obtain the franchise.

In March 1993, Probasco Properties leased the downtown property to CGP, Inc. for 20 years with four five-year options. At the time of trial, thirteen years were left on the lease. The license agreement has the equivalent term balance.

CGP, Inc. pays a monthly franchise fee of six percent to corporate Perkins. CGP, Inc. also pays a monthly rental to Probasco Properties of eight percent of CGP, Inc.'s monthly sales with a minimum monthly lease payment of $11,000.

When the restaurant opened, Ralane continued her employment with Wilson Trailer to maintain health insurance for the family. In the beginning, Craig and Ralane used their home for an office. In January 1994, Ralane terminated her employment with Wilson Trailer and became accounts payable coordinator at the restaurant. Her initial salary was $18,000 per year and that later increased to $32,000 per year. The business was so successful that it became the highest volume Perkins in the system with annual sales in excess of $3,800,000.

Ralane worked in the restaurant from January 1994 through late October 1998, when the serious marital problems the parties had been experiencing came to a head. After October 1998, Ralane no longer worked in the restaurant.

In March 1999, Craig filed this dissolution of marriage action. At the time the parties were living in a home they had purchased in 1986 with a loan of $60,000. Since then, contrary to Ralane's wishes, Craig borrowed over $400,000 to remodel the house. At the time of trial, the homestead had a market value of $350,000 and an encumbrance in excess of $433,000. The parties agreed that Ralane should move. She located a house she liked. Craig borrowed $160,000 to purchase the home for her and had the property deeded to her without any encumbrance.

After Craig filed this dissolution action, he pursued two additional Perkins franchises known as Eastgate and Norfolk. Eastgate was located on the east edge of Sioux City on Highway 20. Norfolk was in Norfolk, Nebraska. In June 1999, Craig formed a corporation, CPRO, Inc., to own the franchises and operate the restaurants. At the same time, Craig formed a limited liability corporation, ProProp, L.C., to own the real estate for the two new restaurants.

Craig owned eighty percent of CPRO, Inc., and Lynn McQuillen owned the other twenty percent. Craig hired McQuillen to assist with operational management and expansion. McQuillen had experience with corporate Perkins and had restaurant management experience. Craig owned ninety-nine percent of ProProp and the parties' daughter, Kally, owned one percent.

Craig applied for the Eastgate franchise in July 1999. In May 2000, corporate Perkins issued Craig a franchise commitment for Eastgate following which Craig started construction of the Eastgate Perkins. Perkins granted Craig the license agreement for the restaurant on December 11, 2000, and the next day Craig opened the restaurant for business.

Problems developed with the acquisition of the real estate for the Eastgate franchise. Although ProProp had executed a purchase agreement for $525,000, title problems prevented consummation of the transaction. At the time of trial, ProProp had not taken title and had not paid the $525,000.

Craig applied for the Norfolk franchise in March 1999 and received a franchise commitment from corporate Perkins in May 2000. By this time ProProp had acquired the real estate for the Norfolk franchise and an adjacent parcel of real estate for a total of $1.5 million. However, at the time of trial, the Norfolk franchise commitment had expired because construction of the restaurant had not started as the commitment had required. Craig testified at trial that he was rethinking whether to proceed with the Norfolk project.

As he did with CGP, Inc., Ted Waitt guaranteed ProProp and CPRO, Inc. debt in an amount exceeding $3 million.

Following a trial on property and alimony issues, the district court dissolved the marriage, awarded Ralane alimony, and divided the property and debts.

Ralane appealed and Craig cross-appealed.

In her appeal, Ralane raised the following issues: (1) whether the district court erred in its $711,500 valuation of the parties' interest in Probasco Properties, (2) whether the district court should have secured Ralane's property division and alimony judgment, (3) whether the district court erred in finding that Ralane made no significant contributions to the Eastgate and Norfolk developments, (4) whether the district court erred in its failure to consider and value the assets of the parties that were wasted during the pendency of the dissolution action, and (5) whether the dis-

trict court erred in failing to order that the parties file a joint income tax return for the year 2000. Ralane also asked for appellate attorney fees.

In his cross-appeal, Craig challenged the district court's award of reimbursement alimony of $60,000 per year for thirteen years.

We transferred the case to the court of appeals. The court of appeals affirmed on all of the issues Ralane raised in her appeal and denied her appellate attorney fees. The court affirmed on the reimbursement alimony issue that Craig raised in his cross-appeal.

Craig filed an application for further review challenging the court of appeals decision on the reimbursement alimony issue. We granted the application.

We agree with the court of appeals on its disposition of the issues Ralane raised in her appeal as well as on the court's denial of her request for appellate attorney fees. We therefore give no further consideration to those issues. Left for our determination is the issue of reimbursement alimony.

## II. Scope of Review.

Because this is an equitable proceeding, our review is de novo. Iowa R.App. P. 6.4. In equity cases, especially when considering the credibility of witnesses, we give weight to the district court's findings of fact, but we are not bound by them. *Id.* R. 6.14(6)(*g*).

## III. Property Division.

Before addressing the reimbursement alimony issue, we think it would helpful to put things in perspective. To do so, we need to show how the court divided the parties' net worth in the marital assets.

The court concluded that Craig should have sole ownership of CGP, Inc., Probasco Properties, CPRO, Inc., and ProProp and should assume the debt against those properties. The court concluded that Ralane had not significantly contributed to the franchises associated with CPRO, Inc. and ProProp and in fact had opposed such expansion. For that reason the court concluded that to the extent Craig has an interest in the Eastgate and Norfolk developments those should be his exclusively. Additionally, the court concluded that it would not give any significant consideration to the Eastgate and Norfolk developments in its division of property and award of alimony.

The court found that CGP, Inc. had a fair market value of $1,282,051. Craig's sixty percent interest, the court found, was therefore $769,000.

Regarding Probasco Properties, the court found it had a fair market value of $1,960,000. After deducting the $537,000 debt against Probasco Properties, the court found Craig's fifty percent interest had a fair market value of $711,500.

Craig's interest in CGP, Inc. and Probasco Properties therefore amounted to $1,480,500. The court awarded one-half of that interest ($740,250) to Craig and one-half to Ralane. However, the court gave Craig credit against Ralane's half for the $160,000 home that Craig purchased for her. That reduced Ralane's award to $580,250. The court granted Ralane judgment against Craig for $580,250 and ordered him to pay the judgment as follows: $100,000 on or before May 1, 2001 with the balance of $480,250 to be paid in seven annual installments of $68,607.14 at 8.052% interest.

In addition, in accordance with the parties' pretrial stipulation, the court awarded Ralane assets totaling $225,832 and ordered her to assume debts of $5000. In accordance with that same stipulation, the

court awarded Craig assets totaling $493,803 and ordered him to assume debts of $517,983. In sum, Ralane received net assets of $801,082, and Craig received net assets of $716,070.

In addition to the property award, the district court awarded Ralane reimbursement alimony of $60,000 per year for thirteen years payable on the first day of April of each year commencing in 2001.

The court also awarded Ralane attorney fees totaling $20,000 and expert witness fees totaling $5000.

## IV. Reimbursement Alimony.

As mentioned, the district court awarded Ralane reimbursement alimony in the amount of $60,000 per year for thirteen years. The court gave the following rationale for the award:

> The alimony award is compensation for Ralane's contribution to Craig's obtaining the downtown Perkins franchise, which, like a professional license, is an ongoing benefit to Craig, which Ralane reasonably relied on as a benefit to her future but for the interruption of this dissolution.

> Craig's gross income is approximately $238,000 per year and is not likely to decrease but is likely to increase given the persistent success of his downtown Perkins franchise. The evidence shows Craig's tax rate is around thirty-two percent (percentage of income paid on taxes). At the time of trial, Craig's income is a result of the success of the downtown Perkins restaurant because the Eastgate and Norfolk properties were not yet producing income to Craig. This income will no longer be shared by Ralane because of the dissolution and the granting of the downtown franchise to Craig.

> Because the lease on the downtown restaurant will be at least for another 12

years, the Court concludes that reimbursement alimony should be paid to Ralane for 13 years and payable in the amount of $60,000 each year and payable on the 1st day of April of each year commencing in 2001.

For reasons that follow, we agree with Craig that the district court's award of reimbursement alimony under the facts of this case is contrary to our case law.

**A. Applicable law.** The purposes of property division and alimony are not the same. *In re Marriage of Francis*, 442 N.W.2d 59, 62 (Iowa 1989). Property division is based on each spouse's "right to 'a just and equitable share of the property accumulated as the result of their joint efforts.'" *Id.* (citation omitted). Alimony "is a stipend to a spouse in lieu of the other spouse's legal obligation for support." *Id.* Iowa Code section 598.21(3)(*c*) (Supp.1999) authorizes a court to consider the property division in connection with a request for alimony.

This court recognizes three different types of alimony. *Francis*, 442 N.W.2d at 63–64. Traditional alimony "is payable for life or so long as a spouse is incapable of self-support." *Id.* at 64.

Rehabilitative alimony is "a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." *Id.* at 63. The goal of rehabilitative alimony is self-sufficiency and for that reason "such an award may be limited or extended depending on the realistic needs of the economically dependent spouse." *Id.* at 64.

Reimbursement alimony was first denominated as such in *Francis*. *Id.* at 64. The concept is an outgrowth of our deci-

sion in *In re Marriage of Horstmann,* 263 N.W.2d 885 (Iowa 1978). In that case, this court held that an advanced degree or professional license is not in and of itself an asset for property division purposes. *Horstmann,* 263 N.W.2d at 891; *accord Francis,* 442 N.W.2d at 62. However, the court in *Horstmann* further held that the future earning capacity flowing from such a degree or license is a factor to be considered in the division of property and the award of alimony. 263 N.W.2d at 891. Iowa Code section 598.21(3)(*e*) authorizes a court to consider the earning capacity of each party on the question of property division.

In *Francis,* the husband was just completing his education as a physician at the time of the dissolution trial. We characterized the case as an "advanced degree/divorce decree" dissolution of marriage action. 442 N.W.2d at 61. The issue as framed on appeal was this: "What compensation, if any, should [the wife] receive for her contribution to [the husband's] increased earning capacity due to his education received during the marriage?" *Id.* We ultimately affirmed an award of reimbursement alimony in the amount of $100,000. *Id.* at 66. In doing so, we offered the following rationale for reimbursement alimony and what it was designed to do:

> As previously stated in this opinion, alimony has traditionally taken the place of support that would have been provided had the marriage continued. A calculation of future earning capacity, in a case like the present one, essentially represents a value placed on the income to be derived from the advanced degree achieved during the marriage. The amount that would have been the student spouse's contribution to the future support of the parties is logically tied, if not wholly determined by, future earning capacity. Thus the court's duty to

look at the future earning capacity of the spouses tracks more closely with a concern for loss of anticipated support, reimbursable through alimony, than through division of as-yet-unrealized tangible assets.

> The alimony of which we speak is designed to give the "supporting" spouse a stake in the "student" spouse's future earning capacity, in exchange for recognizable contributions to the source of that income—the student's advanced education. As such, it is to be clearly distinguished from "rehabilitative" or "permanent" alimony.

*Id.* at 63.

In *Francis,* we also described the circumstances under which reimbursement alimony should be awarded:

> We are persuaded that the trial court neither misapplied legal doctrine nor erroneously misconstrued the evidence so as to compensate [the wife] far beyond her contribution to the marriage, as [the husband] suggests. We conclude, however, that for marriages of short duration which are devoted almost entirely to the educational advancement of one spouse and yield the accumulation of few tangible assets, alimony—rehabilitative, reimbursement, or a combination of the two—rather than an award of property, furnishes a fairer and more logical means of achieving the equity sought under *Horstmann* and its progeny.

*Id.* at 62.

We then determined that reimbursement alimony should not be subject to modification or termination until full compensation is achieved because such alimony

> is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other.... Similar to a

property award, but based on future earning capacity rather than a division of tangible assets, it should be fixed at the time of the decree. In recognition of the personal nature of the award and the current tax laws, however, a spouse's obligation to pay reimbursement alimony must terminate upon the recipient's death.

*Id.* at 64.

■ **B. Analysis.** The facts here militate against an award of reimbursement alimony. The marriage was not one of short duration devoted almost entirely to the educational advancement of one spouse. To the contrary, both parties obtained their degrees and neither contributed to the education of the other.

Although Ralane may not have pursued her career in business as much as she may have liked, she nevertheless was active in the job market during the marriage. In fact, for a time she was active in the operation of the downtown Perkins restaurant. She learned all of the job positions in the restaurant and helped set up an accounting procedure to manage cash flow. So her career skills are not outdated. Moreover, the district court found Ralane "is a very competent and business-minded person with great opportunity for career success in the business community. She has the appropriate people skills and pays attention to detail." Given these facts, we can hardly say that she sacrificed for the benefit of Craig's earning capacity.

This is not a case where the parties have little or no net worth resulting in a case where the "supporting" spouse receives little or nothing by way of a property settlement whereas the other spouse has a substantial earning capacity. The parties had significant assets to balance the equities without the need for an award of reimbursement alimony. Ralane leaves the marriage with a net worth in excess of

$800,000 compared with a net worth of $716,070 for Craig. Additionally, Ralane will be receiving 8.052 in interest on $580,-250—her share of the net worth of the business and real estate. In short, Ralane has her degree, her skills, an unencumbered home and car, and a property award in excess of $800,000 with very little debt. We agree with Craig that Ralane has been compensated for her contributions.

The district court awarded reimbursement alimony because the court believed that Craig has acquired an asset that will produce income for him in the future and Ralane has no such asset. This reasoning ignores that the valuation of the business took into consideration the future earnings of CGP, Inc. and the future rents paid to Probasco Properties. It also ignores the risk that Craig assumes in continuing the business operation. As Craig points out, Ralane has been awarded one-half of the current value of those assets. We agree with Craig that the award of reimbursement alimony in these circumstances amounts to a duplicative award. Moreover, an award of reimbursement alimony in these circumstances effectively means that Ralane would be entitled to future income regardless of whether the business and real estate remain profitable, a result that hardly seems equitable.

■ We note, however, that in his application for further review, Craig suggests that "[p]erhaps Ralane would be entitled to one or two years of financial support (rehabilitative alimony) while she is getting back into the workforce." At oral argument, counsel for Craig suggested that to accomplish this we might order that Ralane keep the payments Craig has already made on the reimbursement alimony award. We think the suggestion is a good one and we adopt it.

## V. Disposition.

Because we conclude reimbursement alimony was not warranted in this case, we vacate the court of appeals decision and reverse the district court judgment on this issue. We modify the judgment of the district court by allowing Ralane to keep as rehabilitative alimony any payment Craig has made on that award.

We affirm the decision of the court of appeals on all of the remaining issues raised in the appeal and the judgment of the district court on those issues. We also affirm the decision of the court of appeals rejecting Ralane's request for appellate attorney fees.

We remand to allow the district court to modify its decree consistent with this opinion.

**COURT OF APPEALS DECISION AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED; CASE REMANDED WITH DIRECTIONS.**