# In the Iowa Supreme Court

No. 24–0830

Submitted November 13, 2025—Filed December 12, 2025

In re the marriage of **Jason C. Owen** and **Alison A. Brinker.**
Upon the petition of **Jason C. Owen,**

Appellee,

and concerning **Alison A. Brinker,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Audubon County, Craig M. Dreismeier, judge.

Both spouses seek further review following the court of appeals' modification of their dissolution decree. **Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed.**

Oxley, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., took no part in the consideration or decision of the case.

Andrew B. Howie (argued) of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Jessica A. Zupp (argued) of Zupp and Zupp Law Firm, P.C., Denison, and Julie G. Mayhall of Julie Greteman Mayhall Attorney at Law PLC, Carroll, for appellee.

**Oxley, Justice.**

Two households are more expensive to maintain than one. And when couples divorce, there is often not enough income between the parties to keep them both at their predivorce lifestyles. Traditional spousal support helps fill that gap following a long marriage and disparate earning capacities between the former spouses. But that is not always the situation—especially in divorces of high-income, high-asset couples.

This case involves the not-uncommon situation where a couple divorces after building a successful business. One party receives the business, and the other receives a large cash equalization payment to essentially buy their half of the business. When financially successful parties divorce, and their property division enables the bought-out spouse to earn sufficient income to maintain their predivorce lifestyle, an award of traditional spousal support is unneeded. In such cases, it is often best to let the parties make a clean break and go their separate ways.

Following a trial in this dissolution action involving Jason Owen and Alison Brinker, Jason retained ownership of the couple's business, and the district court ordered him to make a cash equalization payment of over $3 million to Alison as part of the parties' property division. The investment income associated with that cash payment, together with Alison's ability to earn at least $69,000 per year as an accountant, more than allowed her to maintain the lifestyle she had enjoyed during the marriage. So, the district court denied her request for a $13,500 monthly traditional spousal support award.

On appeal, the court of appeals modified the dissolution decree to award Alison $3,500 per month in spousal support. The court of appeals found it inequitable that Jason's future income potential from the family business was

much greater than Alison's potential from an accounting career. But this reasoning conflates the property division with the need for spousal support. The family business's valuation—which was split with Alison through the equalization payment—already accounted for Jason's future income potential. Using his income potential to also justify spousal support resulted in a duplicative award.

The court of appeals also found the nearly $140,000 gap between the parties' annual incomes "difficult to reconcile without an award of spousal support." Focusing on the gap between the parties' allocated incomes misses the point of a traditional spousal support award, which is to allow the receiving spouse to "maintain the lifestyle to which he or she became accustomed." *In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023). Where Alison's postdivorce income allowed her to support herself at her predivorce lifestyle, the district court properly concluded that it was equitable to award no spousal support.

For the reasons explained below, we vacate the court of appeals' modification and affirm the district court's dissolution decree.

I.

Jason and Alison married in 2003. Jason had recently started a business, Accu-Steel, in 2001, which is a successful company he runs today with eighteen full-time employees. Accu-Steel designs and manufactures fabric-covered steel-framed buildings used in agricultural and commercial industries. Alison had a bachelor's degree in accounting from the University of Northern Iowa and was working as a certified public accountant (CPA) when the couple married. She eventually joined Jason working for Accu-Steel in 2006, where she continued to work until their divorce. Because she was working for Accu-Steel, Alison let her

CPA license lapse in 2009. Jason and Alison have two children, who were born in 2007 and 2009.

The couple accumulated significant assets during their marriage. In addition to the acreage that contained both their home and the Accu-Steel business, they owned a lake house on Lake Panorama and two farms. After more than nineteen years together, Jason petitioned to dissolve the marriage in 2022. The parties stipulated to most of the issues related to the children and let the district court calculate child support. They went to trial to determine the division of the couple's substantial assets and to address spousal support.

For the most part, the parties agreed on who would receive what property but disagreed about some of the valuations. Following a one-day trial where both parties presented expert witnesses and numerous exhibits, the district court issued a thorough twenty-eight-page ruling. It ultimately awarded Jason $7,490,319 worth of assets (net of liabilities), which included the Accu-Steel business, the acreage with the family home that also housed the business, and both farms. It awarded Alison property valued at $1,425,503 (also net of liabilities), including the lake house where she had been living with the children since the couple separated. The court ordered Jason to make a cash equalization payment to Alison of $3,032,408 to split the difference between the parties' property awards.

Alison sought a $13,500 monthly award of traditional spousal support, while Jason argued that none should be awarded. The district court agreed with Jason and denied spousal support altogether.

Alison appealed. The court of appeals affirmed the district court's property valuation and division. But it modified the district court's order denying Alison any spousal support. The basis for its modification was twofold: "First, Alison's

income from the cash equalization payment will be subject to the rising and falling tides of market performance . . . . Second, the large yearly gap in the parties' earning capacities—nearly $140,000—is difficult to reconcile without an award of spousal support . . . ." It modified the dissolution decree to include $3,500 in monthly traditional spousal support.

Both parties sought further review, which we granted. Alison challenges certain property valuations, and Jason challenges the modification to add a spousal support award.

## II.

Alison asks us to revisit her challenges to the valuation of several pieces of property. After a de novo review, "[w]e agree with the court of appeals' analysis" of the property valuations, "and we let that opinion stand as the final decision on that issue." *State v. Dorsey*, 16 N.W.3d 32, 40 (Iowa 2025); *accord In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022) (reviewing a spousal support award while allowing the court of appeals opinion to stand on the remaining issues).

## III.

Jason challenges the court of appeals' modification of the dissolution decree to add a spousal support award. Because we are in equity, we review the district court's order concerning spousal support de novo. Iowa R. App. P. 6.907 ("In equity cases review is de novo."); *see also Pazhoor*, 971 N.W.2d at 537 ("Our review of alimony awards is de novo."). Even so, we give the trial court "considerable latitude," and its "order will only be disturbed 'when there has been a failure to do equity.' " *In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022) (quoting *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015)). Our deference is based on "institutional and pragmatic reasons." *Sokol*, 985

N.W.2d at 182 (quoting *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017)). "[I]nstitutional deference . . . counsels against undue tinkering with spousal support awards." *Id.* "Otherwise, '[w]hen appellate courts unduly refine these important, but often conjectural, judgment calls,' " they encourage costly appeals "wholly disproportionate to any benefit [the parties] might hope to realize." *Id.* at 182–83 (first alteration in original) (quoting *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996) (en banc)). Pragmatic deference acknowledges that "the trial court was in the best position to balance the parties' needs, and we should intervene on appeal only where there is a failure to do equity." *Gust*, 858 N.W.2d at 416.

A spousal support award turns on the ten factors identified in Iowa Code section 598.21A(1) (2022).[1] *See Pazhoor*, 971 N.W.2d at 538 (explaining that the

---

[1]Iowa Code section 598.21A(1) provides the following:

1. *Criteria for determining support.* Upon every judgment of annulment, dissolution, or separate maintenance, the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:

*a.* The length of the marriage.

*b.* The age and physical and emotional health of the parties.

*c.* The distribution of property made pursuant to section 598.21.

*d.* The educational level of each party at the time of marriage and at the time the action is commenced.

*e.* The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

*f.* The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

*g.* The tax consequences to each party.

*h.* Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

general assembly has instructed courts " 'to equitably award spousal support by considering' the criteria listed in Iowa Code section 598.21A(1)" (quoting *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016))). Alison seeks indefinite (until she remarries or dies) traditional spousal support, given their nineteen-year marriage. *See Sokol*, 985 N.W.2d at 185 ("[T]raditional spousal support is equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed."); *Gust*, 858 N.W.2d at 410 ("[D]uration of the marriage is an important factor for an award of traditional spousal support[,] . . . where life patterns have been largely set . . . ."). But traditional support is not automatic for a marriage that hits a certain anniversary. *See* Iowa Code § 598.21A(1)(*a*) ("[T]he court *may* grant an order requiring support payments . . . after considering," *inter alia*, "[t]he length of the marriage." (emphasis added)); *cf. Gust*, 858 N.W.2d at 410–11 ("Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support."). Rather, "[t]he purpose of a traditional . . . alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Gust*, 858 N.W.2d at 408 (quoting *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997) (en banc)); *see also* Iowa Code § 598.21A(1)(*f*) (including as a consideration "[t]he feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal").

---

*i.* The provisions of an antenuptial agreement.

*j.* Other factors the court may determine to be relevant in an individual case.

An award of traditional spousal support "is primarily predicated on need and ability." *Gust*, 858 N.W.2d at 411 (quoting *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998) (en banc)); *see also In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005) ("Traditional alimony is 'payable for life or so long as a spouse is incapable of self-support . . . .' " (omission in original) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989) (en banc))). The receiving spouse's need for support is measured using her "standard of living reasonably comparable to that enjoyed during the marriage." *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 598.21A(1)(*f*)). "The standard for determining need is thus objectively and measurably based upon the predivorce experience and private decisions of the parties, not on some externally discovered and imposed approach to need, such as subsistence or adequate living standards or amorphous notions of self-sufficiency." *Id.*

The other side of a traditional spousal support calculation is the paying spouse's ability to pay. *Id.* at 412 (citing *In re Marriage of Woodward*, 426 N.W.2d 668, 670 (Iowa Ct. App. 1988)). "Ideally, the support should be fixed so the continuation of both parties' standard of living can continue, if possible." *Pazhoor*, 971 N.W.2d at 543 (quoting *In re Marriage of Stenzel*, 908 N.W.2d 524, 534 (Iowa Ct. App. 2018)).

In assessing the need for spousal support, we look to the receiving spouse's earning capacity rather than her actual income. *See Gust*, 858 N.W.2d at 411; *Mauer*, 874 N.W.2d at 107 ("[F]air and equitable consideration of the section 598.21A(1) criteria ordinarily places some degree of emphasis on the duration of the marriage and the earning capacities of the spouses as demonstrated by the historical record."); *see also* Iowa Code § 598.21A(1)(*e*) (requiring consideration of "[t]he earning capacity of the party seeking maintenance" based on several

factors, including his or her education, work experience, and time out of the workplace to care for children). When one spouse receives significant liquid assets in the property division, the accompanying investment income is included in that spouse's expected income. *See Mauer*, 874 N.W.2d at 110–11.

Here, the district court attributed to Jason an annual income of $420,854.60 based on an average of the income reflected in his portion of the couple's Iowa income tax returns over the last five years. Those returns allocated to Jason Accu-Steel's net profits, passed through to Jason as its sole shareholder based on its S corporation status, as well as farming income recognized through another of the parties' entities, JA Ranch.

By the time of trial, Alison was no longer working for Accu-Steel. Nonetheless, the district court attributed an annual salary of $69,000 to Alison based on her education and work experience, noting she could earn more if she renewed her lapsed CPA license. It also concluded that Alison could earn $212,269 per year from investing the $3 million-plus equalization payment at a rate of 7%, bringing her annual income to $281,269.

The district court then considered Alison's living expenses. Her affidavit of financial status itemized just over $25,000 of expenses per month, or $300,000 per year. Alison admitted at trial that this amount was "fully loaded" by including mortgage payments owed on the two farms "in case [she] got those." Even after backing out the $6,640 payments for the farm mortgages Alison would not be paying, the district court found "difficulty in determining [that] her monthly living expenses are even close to the figures she noted in her affidavit of financial status." For instance, the $2,790 claimed monthly entertainment expenses were unsupported and inconsistent with the testimony about the couple's marital lifestyle. The $6,400 monthly expense for car payments, property taxes, vehicle

maintenance, and professional fees also stuck out to the district court since none of the three vehicles Alison received had car loans and the property taxes for the lake house—which she received debt-free—were approximately $9,200 per year, less than $800 per month. Alison did not elaborate on her lifestyle during her testimony, but Jason testified that they were both fairly frugal. Crediting Alison's testimony that her bank statements reflected average monthly expenditures of $2,600 throughout 2022 and $3,800 in 2023, including paying off her credit cards each month, the court concluded that "Alison's need is not as great as portrayed."

Ultimately, the district court declined to award any spousal support to Alison. Commenting on the difference between the parties' incomes, the court noted that "when the interest payments Jason will need to make on an annual basis are factored into the equation, any discrepancy quickly disappears." With respect to Alison's need for a spousal support award to maintain her lifestyle, the court concluded that Alison's "monthly living expenses are not even close to her $25,000 per month projection. Alison can be self-sufficient if she chooses such."

On appeal, Alison argues that she was "an equal partner" in building Accu-Steel into a successful business, and Jason has cheated her out of sharing in the "substantial cash flows" that business will create into the future. Nor will she have access to the Accu-Steel retained earnings out of which the couple took shareholder distributions to make investments, purchase the lake house, and pay down the mortgages on the farms. In her view, it is inequitable for Jason to receive the income-producing assets while she received only cash.

The court of appeals agreed with Alison, explaining that "Jason's stipulated award of Accu-Steel will provide him a much larger ceiling for income

growth than will Alison's accounting career." Although its modification to award Alison $3,500 per month was significantly less than the $13,500 she requested, the court of appeals noted that its "award provides some buffer for poor market years . . . and closes the gap between the parties' incomes."

While spousal support and property divisions are intertwined, *compare* Iowa Code § 598.21(5)(*h*) (requiring courts to consider spousal support payments under section 598.21A in equitably dividing property), *with id.* § 598.21A(1)(*c*) (requiring consideration of property distributions made under section 598.21 in determining a spousal support award), they serve different purposes. "Property division is based on each spouse's right to a just and equitable share of the property accumulated as the result of their joint efforts. Alimony is a stipend to a spouse in lieu of the other spouse's legal obligation for support." *In re Marriage of Probasco*, 676 N.W.2d 179, 184 (Iowa 2004) (citation modified).

Alison's reasoning, accepted by the court of appeals, conflates valuing the Accu-Steel business for purposes of the property division with determining the appropriateness of a spousal support award. It also ignores the risks associated with operating that business—now encumbered by an approximate $3 million loan to fund Alison's cash equalization payment. We rejected similar reasoning in *In re Marriage of Probasco*, where "[t]he district court awarded reimbursement alimony because the court believed that Craig has acquired an asset[—i.e., the couple's business—]that will produce income for him in the future and Ralane has no such asset," even though Ralane received $580,250 in cash representing her half of the business. 676 N.W.2d at 186. We explained:

> This reasoning ignores that the valuation of the business took into consideration the future earnings of CGP, Inc. and the future rents paid to Probasco Properties. It also ignores the risk that Craig assumes in continuing the business operation. As Craig points out, Ralane has been awarded one-half of the current value of those

assets. We agree with Craig that the award of reimbursement alimony in these circumstances amounts to a duplicative award.

*Id.*

The same is true here. Both parties' experts used a hybrid between an income-based and a market-based approach to value the equity in Accu-Steel. By definition, an "income-based approach values a business based on an estimate of the company's future earnings." 137 Am. Jur. Proof of Facts 3d 267, § 15, at 296 (2013). As Alison's expert explained in his valuation report:

> There is consensus within the business valuation profession that earnings and cash flows are the primary sources of future benefits to a company and its owners and are therefore the most important factors affecting the going-concern value of most operating companies. . . . [T]he value of a company is the present value of future benefits (usually earnings, cash flows, or distributions) that accrue to the shareholders. The income-based approach calculates value using this premise directly as future earnings or cash flows are converted to a present value by using an appropriate discount rate . . . or capitalization rate . . . .

To the extent that Jason has a "larger ceiling" for future income growth, that fact has been accounted for in the property division. The same is true with respect to Alison's complaint that she can no longer tap into Accu-Steel's retained earnings. She received her half of the equity in Accu-Steel through the cash equalization payment. Considering Jason's larger ceiling for income growth through Accu-Steel to justify a spousal support award improperly double counts the company's equity. *See Probasco*, 676 N.W.2d at 186.

The focus on Jason's potential future income from Accu-Steel also ignores the risks associated with operating a closely held business. The court of appeals erred in providing a "buffer for poor market years" to Alison, particularly where Jason has no similar buffer. *See id.* ("[A]n award of reimbursement alimony in these circumstances effectively means that Ralane would be entitled to future income regardless of whether the business and real estate remain profitable, a

result that hardly seems equitable."). This is the type of "undue tinkering" that appellate courts should avoid. *Sokol*, 985 N.W.2d at 182. Indeed, awarding spousal support absent a need for it increases the possibility of future litigation between the parties through a petition for modification.

The court of appeals' concern about "clos[ing] the gap between" the parties' incomes also misconstrues the purpose of traditional spousal support. The purpose is not to equalize the parties' respective incomes. Rather, it is to allow the receiving party to maintain her previous lifestyle to the extent possible within the paying spouse's ability to pay an award. *See id.* at 185; *cf. In re Marriage of Sychra*, 552 N.W.2d 907, 908 (Iowa Ct. App. 1996) ("An alimony award is justified when the distribution of the assets of the marriage does not equalize the inequities and economic disadvantages suffered in marriage by the party seeking the alimony *who also has a need for support.*" (emphasis added)). On that point, after a de novo review of the record, we conclude that the district court's decision not to award spousal support is well supported. Although Alison describes the 7% return used by the district court to calculate her investment income as "speculative," she does not suggest on appeal that a different interest rate should be used. Instead, she argues that much of Jason's expenses will be paid by Accu-Steel, and it is inequitable that she will have to pay hers out of pocket. But that is the wrong analysis.

The district court concluded that Alison could earn $281,269 per year between her experience working as an accountant and the investment income from the equalization payment. Even accepting Alison's "fully loaded" estimate of her expenses at $25,158 per month—reduced by the $6,640 farm mortgage payments she concededly will not pay—Alison has a monthly need of $18,518 per month, or $222,216 per year. Never mind the other expenses that the district

court—which was in the best position to judge the witnesses' credibility—questioned from Alison's fully loaded estimate. This leaves her with an annual excess of $59,053 ($281,269 - $222,216), almost two percentage points' worth of investment income on the $3 million cash payment.

That Jason could purportedly afford to pay more does not change Alison's needs, which she can meet on her own after the property division. In *In re Marriage of Mauer*, we reduced a $25,000 monthly traditional spousal support award to an ophthalmologist's wife to $12,600 based on her needs, not on her husband's income. 874 N.W.2d at 111. In determining a proper award, we calculated the difference between the wife's needs of $208,000 per year and her ability to earn $57,000 per year through employment and investments, which left a need of $151,000 per year, or $12,583.33, per month. *Id.* We therefore modified the district court's $25,000 monthly award down to $12,600—rounding her calculated need of $12,583 to a round number—as "an equitable spousal support award." *Id.* The only thing we said about the husband's income was that "Richard's substantial income from his ophthalmology practice is more than adequate to support this award." *Id.* We did not attempt to equalize the parties' incomes through a spousal support award. *See id.* The same applies here. The fact that Jason's income is "more than adequate," *id.*, to pay a spousal support award is irrelevant if Alison does not need one.

Finally, even if we considered the difference between the parties' incomes, the $140,000 gap more than disappears when considering the interest Jason must pay to service the loan used to fund the equalization payment. If Jason could secure a loan even at a 5% interest rate (which is contrary to the evidence, including that Accu-Steel's current line of credit has a rate of 9.85%), the annual interest payment would exceed $150,000. The court of appeals seemingly

ignored this point, which the district court explicitly recognized. Nor did the court of appeals consider the tax implications of its modification to add a spousal support award, *see* Iowa Code § 598.21A(1)(*g*), which is no longer deductible for the paying spouse or included in the receiving spouse's taxable income, *see Pazhoor*, 971 N.W.2d at 538 n.2.

When divorcing parties have sufficient assets to balance the equities and sufficient incomes to leave each spouse in a place to sustain their predivorce lifestyle, there is no need for an award of traditional spousal support. *Cf. Probasco*, 676 N.W.2d at 186 (reversing award of rehabilitation spousal support where the wife was awarded one-half of the current value of the parties' business in cash, on which she would receive significant investment income). The district court's decision to deny Alison's request for spousal support was well within its "considerable latitude," *Mills*, 983 N.W.2d at 67 (quoting *Gust*, 858 N.W.2d at 406), and should be left alone.

IV.

The court of appeals opinion is vacated with respect to its modification to include a spousal support award and affirmed on the remaining issues. The district court's dissolution decree is affirmed.

**Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed.**

All justices concur except Christensen, C.J., who takes no part.