# IN THE COURT OF APPEALS OF IOWA

No. 14-1333
Filed October 14, 2015

IN RE THE MARRIAGE OF SUSAN ELIZABETH LARSON
AND JEFFREY CARL LARSON

Upon the Petition of
SUSAN ELIZABETH LARSON,
    Petitioner-Appellant,

And Concerning
JEFFREY CARL LARSON,
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

Wife appeals from the provisions of the dissolution decree awarding alimony and child support. **AFFIRMED AS MODIFIED.**

Kodi A. Brotherson of Becker & Brotherson Law Office, Sac City, and Timothy G. Pearson of Laden & Pearson, P.C., Des Moines, for appellant.

Bernard L. Spaeth Jr. and Kimberly S. Bartosh of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

Heard by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

Susan Larson appeals from the district court's findings of fact, conclusions of law, and decree of dissolution of marriage. She maintains the district court failed to do equity by ordering Jeffrey Larson to pay spousal support in the amount of $2500 for two years. She also maintains the child support award is inconsistent with Iowa law. She maintains the trial court abused its discretion by ordering Jeffrey to pay $7500 of her attorney and expert fees, and she asks for us to award her appellate attorney fees.

Because Susan needs time to update her skills and reenter the workforce, we award Susan a combination of rehabilitative and traditional spousal support. She has requested $5000 a month, and we agree the rehabilitative spousal support should be fixed in that sum for two years. Because of the significant disparity in incomes and the unlikelihood that Susan will ever be able to achieve the lifestyle the couple maintained during their thirty-two year marriage, we award Susan traditional spousal support in the amount of $3000 monthly until Susan reaches the age of sixty-seven, remarries, or one of the parties dies. We modify the district court's award of attorney fees to require Jeffrey to pay $22,500 toward Susan's legal and expert fees, and we decline to award either party appellate attorney fees. We affirm the dissolution decree as modified.

**I. Background Facts and Proceedings.**

Both parties were born in 1961 and were fifty-two years old at the time of the dissolution proceedings. The parties married in 1982 while both were in college. Susan received a bachelor of science in industrial engineering from Iowa State University in 1983. She later went on to obtain a masters of business

administration from Drake University in 1995, which she obtained while also employed. Jeffrey received a bachelor of science in construction engineering from Iowa State University and also graduated in 1983.

Susan was employed by Tone Brothers, Inc. as a project engineer from 1983 until 1995. At the time she left, Susan was earning $85,000 annually. The family then moved to Kansas City, and Susan began working for Danisco Ingredients USA, Inc. She remained with that company until 2000, when the family relocated to Des Moines. She earned $88,500 annually at the time of the relocation.

The family relocated to Des Moines in 2000 so Jeffrey could start his own company, Larson & Larson Construction, L.L.C. Because Jeffrey was working approximately 100–120 hours per week, the parties agreed that Susan would stay home and raise the parties' two children.

Larson Construction did well financially until approximately 2010. In 2011, the company suffered a net loss of $367,902. In 2012 the company suffered a loss of $197,559, and in 2013 the company suffered a loss of $1,026,915.[1] In regard to the significant loss suffered in 2013, Susan claims the loss was a result of Jeffrey having an affair and not focusing on the business. Jeffrey argues the loss was the result of "the economic downtown, increased competition in the construction industry, tighter margins, and financial adversity created by several lawsuits." At the time of trial, the company was anticipating to suffer a loss again in 2014 although the business looks better after 2014.

---

[1] The amount of these losses includes the amount taken by Jeffrey for salary and distributions.

Jeffrey paid himself a salary from Larson Construction. He testified he paid himself $184,800 annually[2] or $15,400 monthly. In addition to his salary, Jeffrey testified that the corporation paid for his cell phone, health insurance, life insurance, car insurance, and gasoline. Jeffrey also took distributions from the company. As the sole shareholder, Jeffrey had total control of when he took distributions and the amount he took. Historically, Jeffrey took distributions even when the company was "not profitable." He took the following distributions:

| | |
|------|----------|
| 2009 | $641,563 |
| 2010 | $578,185 |
| 2011 | $200,000 |
| 2012 | $151,000 |
| 2013 | $190,981 |

In 2013, Jeffrey reimbursed the business $49,000 of the distributions so the net amount for 2013 was $141,981.

Each party hired an accounting expert to testify at trial. Both experts testified that each time Jeffrey took a distribution when the company was not profitable, he was removing equity from the company. Any distributions taken between December 1, 2010, and March 31, 2014[3] reduced the equity of the company. However as of March 31, 2014, the company had a net equity of $2,031,191.

The parties sold the family home in 2008. Unbeknownst to Jeffrey, Susan took $30,000 from the proceeds and placed it in a bank account that was in her name only. The family then moved into a newly built home in Grimes. The property cost approximately $1.78 million to build, and the lot for the home cost

---

[2] For a few years during the economic downturn, he paid himself a salary of $176,800 because everyone in the company took a drop in their salaries.
[3] This was the latest date numbers on the company were available at the time of trial.

an additional $130,000. The parties had a $1 million loan, and the business covered the rest of the expense. The parties sold the house in 2013 for approximately $1.25 million, and both Susan and Jeffrey received $119,248 of the proceeds.

Susan was not employed at the time of trial. She had retained a vocational expert, Julie Svec, in February 2013. Svec opined Susan could obtain a position as an industrial engineer earning approximately $58,500 annually. Svec indicated it would take some time—up to two years—for Susan to find work because she needed to update some of her skills after being out of the workforce for fourteen years. At the trial in May 2014, Susan testified she had not taken steps to update her skills. She had two in-person interviews and three telephone interviews during the pendency of the proceedings, but she had not been offered any positions. No physical or mental disabilities precluded Susan from being able to work and, by her own admission, there was no reason she could not work full-time. Susan testified she knew she would need to seek employment.

Before trial, the parties reached an agreement on some issues and entered into a stipulated agreement. The parties agreed Susan would receive $750,000 to be paid monthly over ten years with interest accruing at 3.75% interest per annum. This constituted less than half of the value of Larson Construction. Jeffrey then received "all right, title and interest in" the business. The parties also evenly divided their retirement funds with each party receiving approximately $400,000. The parties also agreed to split the 2013 tax refund, and each anticipated receiving approximately $101,000.

At the time of the dissolution proceedings, the parties had one minor child, born in 1998. The minor daughter was to live with Susan until she left for college in approximately two years. The parties' son had graduated high school and was eighteen years of age.

As part of the dissolution decree, the court awarded $1300 monthly in child support for the minor child. The court used an income of $184,500 annually for Jeffrey—considering his salary but none of the distributions. The court imputed an annual income of $30,000 for Susan because "there was no physical or mental reason why she should not be able to work a full-time job. Further, the court found "[Susan's] experience, education and skills indicate that she is employable." The court also took into consideration the interest Susan would receive from the $750,000 property distribution.

The court awarded Susan $2500 in monthly alimony for a period of two years. The court considered Susan's portion of the marital assets as well as the fact she could expect to earn $58,500 annually once she became employed.

Susan also sought attorney fees and expert fees in the amount of $45,000. Susan had already paid $70,000 of expert fees with marital funds including the $30,000 she had placed in a separate bank account after the sale of the family home in 2008. The court ordered Jeffrey to pay $7500 of the remaining fees.

Susan appeals.

## II. Standard of Review.

Our review is de novo. *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998). "We are obliged to examine the entire record and adjudicate rights

anew on the issues properly presented." *Id.* "No hard and fast rules govern the economic provisions in a dissolution action; each decision turns on its own uniquely relevant facts." *Id.* Generally, we will disturb the trial court's ruling only when there has been a failure to do equity. *Id.*

We review an award of attorney fees that includes expert fees for an abuse of discretion. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). An abuse of discretion occurs when the district court exercises its discretion "on grounds or for reasons that are clearly untenable or to an extent clearly unreasonable." *Id.* "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.*

**III. Discussion.**

**A. Alimony: General Principles.**

Susan maintains the district court failed to do equity when it ordered Jeffrey to pay her alimony in the amount of $2500 per month for a period of two years. She maintains the alimony award should be $5000 for a period of fifteen years, which is when she will reach sixty-seven years of age and be eligible for retirement benefits.

A court may grant an order requiring support payments to either party for a limited or indefinite period of time after considering all of the following factors:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.

e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

g. The tax consequences to each party.

h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

i. The provisions of an antenuptial agreement.

j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A (2011). Spousal support is not an absolute right. *In re Marriage of Fleener*, 247 N.W.2d 219, 220 (Iowa 1976). Whether spousal support is proper depends on the facts and circumstances of each case. *Id.*

Iowa law recognizes three forms of alimony—traditional, rehabilitative, and reimbursement—and each has a different aim. *In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008). Rehabilitative spousal support is meant to support an economically-dependent spouse for a limited time in order to provide an opportunity for that spouse to become self-supporting through further education or retraining. *Id.* Reimbursement spousal support provides the receiving spouse with a share of the other spouse's future earnings as repayment for the contributions made to the source of that income. *Id.* Finally, traditional spousal support is "payable for life or so long as a spouse is incapable of self-support." *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989). The court may award a combination of types of alimony. *See Becker*, 756 N.W.2d at 827 ("[T]here is nothing in our case law that requires us, or any other court in this

state, to award only one type of support."). The focus is whether the award is warranted by consideration of the factors enumerated by the legislature. *See id.*

We view Susan's request for alimony for fifteen years as a request for traditional alimony. "Traditional spousal support is often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.'" *In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015) (citing *Francis*, 442 N.W.2d at 62–63). Recently, our supreme court reviewed the general principles relative to traditional alimony in *In re Marriage of Gust*, 858 N.W.2d at 415. In *Gust,* our supreme court observed that our case law "demonstrates that duration of the marriage is an important factor for an award of traditional spousal support." *Id.* at 410. A common "durational threshold" to "merit serious consideration for traditional spousal support" is twenty years. *Id.* at 411. "[W]hen the parties agree a spouse should stay home to raise children, the economic consequences of absence from the workplace can be substantial." *Id.* The length and amount of an award of "traditional alimony is primarily predicated on need and ability." *Id.* (citing *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998)).

"[T]he yardstick for determining need has been the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Id.* (citing Iowa Code § 598.21A(1)(f)). The standard for determining need is an objective standard and is measured "based upon the predivorce experience and private decisions of the parties, not on some externally discovered and imposed approach to need, such as subsistence or adequate living standards or amorphous notions of self-sufficiency." *Id.* "In

determining need, we focus on the earning capability of the spouses, not necessarily on actual income." *Id.* Where the disparity in earning capacity is great, awards both of alimony and substantially equal property distribution have been affirmed. *Id.*

Here, the parties were married for thirty-two years. At the time of the dissolution proceedings, they were both fifty-two years old and in good health. Susan had a bachelor of science as well as a master's degree in business administration, but she had been out of the workforce for fourteen years and needed to update her skills. A vocational expert estimated it would take approximately two years for Susan to find employment and believed she could anticipate a salary of approximately $58,500 annually once she did.

Jeffrey had a bachelor of science degree and was the sole shareholder in a construction business he had started approximately fifteen years earlier. For the past five years and all but three of those fourteen years, he received a salary of $184,800 annually. He also received distributions from the company at the times and in the amounts he chose. Because the company had been less profitable recently or suffered a loss, any distributions taken after December 1, 2010, reduced the equity in the company. The parties had two children during their marriage. Their son had recently turned eighteen and graduated from high school. He was planning to attend college and would not live at home while he did so. The parties' daughter was sixteen and starting her junior year at high school. She lived with Susan.

The parties stipulated to the division of assets before the dissolution proceeding. Susan was to receive $750,000 to be paid monthly over ten years

with interest accruing at 3.75% interest per annum. This constituted less than half of the value of Larson Construction.[4] Jeffrey then received "all right, title and interest in" the business. The parties also equally divided their retirement funds with each party receiving approximately $400,000. The parties agreed to split the 2013 tax refund, and each anticipated receiving approximately $101,000. Each party had also received $119,248 from the sale of the family home in 2013.

The district court declined to consider past distributions Jeffrey had taken from the company when deciding the alimony award. The district court reasoned:

> To now factor in the amount of past distributions that Jeff took from the companies for purposes of determining spousal support is not equitable. First, Susan received the benefit of the past distributions while the marriage was intact. Second, the court views Susan's request as an attempt to obtain the future earnings of the companies when she, by agreement, relinquished her future interest in these companies for the amount of $750,000. Furthermore, if the companies are not profitable, she will simply add to their unprofitability by receiving funds that erode the companies' equity. Third, she received a large property settlement as outlined above that provides additional compensation for her relinquishment of her career and its monetary benefits in 2000.

We agree it would be unfair to Jeffrey to consider the distributions he received when the company was flourishing. However, even if we consider his salary and company benefits alone, we believe the district court failed to do equity regarding the spousal support award for the reasons to follow.

---

[4] As previously stated, as of March 31, 2014, the business had a net equity value of $2,031,191.

**B. Rehabilitative Alimony.**

We first observe Jeffery has not appealed from the amount or duration of the alimony award. Susan argues the amount should be increased to $5000 per month. We conclude Susan should be awarded the sum of $5000 per month for two years as rehabilitative alimony.

Although Susan will have some income from the interest on the property settlement and will also receive child support until the parties' daughter reaches majority, the vocational expert believed it could take up to two years for Susan to update her skills and find work.

Susan's monthly expenses totaled approximately $8000 while Jeffrey's expenses were approximately $5815. Both were living in three-bedroom homes of similar sizes at the time of trial, but the couple's minor child lived with Susan, which accounted for some of the difference in expenses.

The district court maintained $2500 per month was sufficient because Susan could rely on other marital assets she received in the settlement to cover her monthly expenses. However, we do not believe requiring Susan to use other assets is equitable because Jeffrey is able to pay the alimony and child support and still have more than enough to cover his expenses with the wage he receives without invading any of his share of the property award.[5]

After two years, we do not believe Susan will require rehabilitative alimony as she should be retrained and employed based upon the evidence presented.

---

[5] We note the order on temporary matters required Jeffrey to pay $5000 in alimony, $2000 in child support, and the parties' mortgage of $7523 each month.

The question then becomes whether Susan should be entitled to spousal support beyond the two years.

### C. Traditional Alimony.

Even after Susan updates her skills and rejoins the work force, it is unlikely she will ever be able to generate enough income to support herself in the style the parties lived during the marriage. *See* Iowa Code § 598.21A(1)(f) (listing "[t]he feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal" as a factor to be considered when ordering support payments (emphasis added)). "The purpose of a traditional . . . alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). She once resided with Jeffrey in a residence valued over $1.2 million with a swimming pool, and she now resides in a townhouse. As Jeffrey noted, they did not take expensive vacations but they could basically do "what we wanted when we wanted to do it."

We consider the property distribution and spousal support provisions of a decree together to determine their sufficiency. *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). Spousal support is justified when the distribution of the marital assets does not equalize the inequities and economic disadvantages suffered in marriage by the party seeking the support, and there is a need for support. *Id.* While the property distribution is designed to sort out property interests acquired in the past, spousal support is made in contemplation

of the parties' future earnings and is modifiable. *Id.* at 59–60. The spouse receiving spousal support is expected to earn up to their capacity. *See In re Marriage of Wegner*, 434 N.W.2d 397, 399 (Iowa 1988).

One concern here is the fact a substantial portion of the property settlement is structured to be paid over ten years and is unsecured. Clearly this payment arrangement will assist Jeffrey to continue his construction company. However, Susan will not have access to her entire share of the property settlement until the passage of the ten years. This is a significant period of time before Susan will have access to her share of the marital assets. She will earn interest on the unpaid balance, but she will not have access to the monies until paid. Moreover, Jeffrey contends he is losing business and the company is not profitable. If the business closes its doors, Susan's ability to collect the installments is at risk as an unsecured debt owed to her. Susan's only protection in the decree and property stipulation is that the full unpaid balance must be paid if Jeffrey sells his business entities.

On the other hand, if the business continues and Jeffrey continues to receive a salary of $184,800 and distributions in the range of $140,000 to $200,000 as he did during 2011 through 2013, Jeffrey will be able to pay the annual property settlement payments of $75,000 and interest from his distributions alone.[6] In the latter scenario, Jeffrey will still have income from his salary, generous company benefits, and the remaining amount of any distribution he may receive. This could total $230,000 or more based upon past amounts. In

---

[6] We assume, just as it appears both parties and the district court have assumed, that the annual payments to be made by Jeffrey will include the principal and interest.

comparison, Jeffrey will have at least three times more income than Susan even after his payment of child support or his college subsidy obligations. The disparity in the parties' incomes is substantial. Accordingly, we believe this is a long-term marriage deserving of both a relative equal property settlement and traditional alimony.

*1. Duration.* In respect to the duration of the traditional alimony, we note that "traditional alimony is ordinarily unlimited in duration except upon remarriage of the payee spouse, or death of either party." *Gust*, 858 N.W.2d at 415. Because this was a lengthy marriage of thirty-two years, we believe Susan's request that spousal support be paid until she is sixty-seven years of age is reasonable. Both parties are the same age, are still able to work, are in good health, and have the benefit of some retirement investments.

*2. Amount.* Susan requested alimony in the amount of $5000 per month. Although we conclude this sum is reasonable for the rehabilitative alimony award, after the passage of two years we anticipate Susan will be retrained and employed. The sum of $5000 per month appears too generous beyond this rehabilitative period, notwithstanding Jeffrey's likely ability to pay that sum.

In *Gust*, our supreme court noted that in determining the proper amount of traditional alimony, "we do not employ a mathematical formula to determine the amount of spousal support" where the spouses have a substantial disparity in incomes. *Id.* at 411–12. Notwithstanding, the court has approved of an amount where it approximated "thirty-one percent of the difference in annual income between spouses." *Id.* at 412. We do not believe the court intended *Gust* to set a fixed percentage. It remains our duty imposed by our legislature to apply the

statutory factors set forth in Iowa Code section 598.21A. Yet at times the factors leave the trial court with little guidance in fixing the specific amount. The percentage applied in *Gust* is useful to allow a court to "be in the ball park" but the percentage amount may still be "out in left-field" because of the factors set forth in section 598.21A. If the statutory factors do not weigh heavily to either side, the thirty-one percent of the parties' net incomes provides a reasonable guide, as approved in *Gust.*

Considering Jeffrey's worst income year of 2013, he still had a salary of $184,880 and distributions in the sum of $141,981[7] for a total of $326,381. After two years, Susan can be expected to earn $58,500. Premised upon Jeffrey's worst year and Susan earning $58,500 after the payment of the $75,000 property settlement annual payment plus interest, the difference in the gross incomes of the parties is approximately $177,000.[8] If we reduce this sum by a modest amount of income and payroll taxes of thirty percent, the difference in their net incomes would be approximately $123,750. Thirty-one percent of the amount is $38,362 or $3197 per month.[9] Although our calculations are premised upon some assumptions and averages, the *Gust* percentage remains a useful tool to get us in the "ballpark" of the proper amount of spousal support.

In two years, the parties' youngest child will be starting college, and we expect Susan will be gainfully employed. Although Susan will no longer be

---

[7] In 2013, Jeffrey took $190,981 in distributions. However, he then returned $49,000 to the business.

[8] We estimate the average annual interest Jeffrey will be required to pay as $15,470. Each year will differ in amount as the unpaid balance and interest decline over the ten years.

[9] Because we do not have the benefit of the parties' personal tax returns, we can only estimate the parties' personal tax liability and their respective net incomes.

receiving child support, her living expenses should be reduced, and she will have income from her employment. Additionally, she will have interest income.[10] But the substantial income disparity continues to exist, and she certainly will not be able to live the lifestyle she once enjoyed without spousal support.

We also believe the amount is fair and reasonable to Jeffrey as we have not factored in his generous company benefits, and we considered his worst financial year of the past five years. Moreover, Jeffrey is not deprived of his opportunity to enjoy his established standard of living, and he need not invade the equity in his business to afford the $3000 per month traditional alimony award.[11]

Upon our de novo review, we find Susan is entitled to rehabilitative spousal support in the amount of $5000 per month for two years. After two years, Susan is entitled to traditional spousal support in the amount of $3000 per month until she reaches age sixty-seven, remarries, or either party dies.

***3. Spousal support award is not duplicative.*** Jeffrey argues, and the district court determined, the award of spousal support is a duplicative of the property division. We do not agree. The present facts are distinguishable from *In re Marriage of Probasco*, 676 N.W.2d 179,186 (Iowa 2004), upon which Jeffrey relies. In *Probasco*, the marriage lasted only thirteen years, and thirteen years of reimbursement alimony was awarded along with an equal division of the

---

[10] After two years, Susan will no longer be receiving child support of $1300 or the rehabilitative spousal support of $5000 for a total of $6300. However, she will be receiving traditional alimony of $3000 and employment income. If she is earning $58,500 as her expect testified, Susan's employment income should be sufficient, along with the traditional spousal support, to equal or slightly exceed the $6300 she receives the first two years.

[11] Jeffrey's financial affidavit reflects net monthly income of $9988 and expenses of $7095, which includes $1000 per month in meals and food for one person.

value of an ongoing business. 676 N.W.2d at 182. The court noted the reimbursement alimony award along with the property division was a duplicative award because it meant the payee would be entitled to future income whether or not the business remained profitable and the risk was solely upon the payor. *Id.* at 186. Unlike reimbursement alimony that is not modifiable, traditional alimony may be modified. *See Francis*, 442 N.W.2d at 63-64. Thus, if Jeffrey's business fails and his income is adversely affected, he may seek modification of the alimony award. Moreover, Susan is at some further risk because the property settlement payments extend over ten years and the obligation is unsecured.

**D. Child Support Award.**

Susan maintains Jeffrey's child support obligation is inconsistent with Iowa law because the district court should have considered the distributions from the company as part of Jeffrey's income.

The child support guidelines "establish the amount of child support largely by determining the 'net monthly income' of each parent derived from their 'gross monthly income.'" *Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005); *see also* Iowa Ct. R. 9.5 (defining net monthly income as gross monthly income minus applicable deductions). "The guidelines do not define gross income, but we have on a number of occasions included such items as overtime income, incentive pay, and bonuses as gross income." *Markey*, 705 N.W.2d at 19. "In each instance, the key to including the item of extra income primarily focused on whether it was reasonably expected to be received in the future. If extra income is uncertain or speculative, or if it is an anomaly, it is excluded." *Id.*

In *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 485–86 (Iowa 2012), our supreme court considered the distributions the husband received from an S corporation in determining the husband's income. Susan maintains the district court should have done the same here. However, we believe the present situation is distinguishable from *Schenkelberg*. Here, the company was not profitable from December 2010 to April 2014—the last time numbers were available—and the company anticipated another year with losses in 2014. Both experts agreed any distributions taken from the company while it was not profitable reduced the equity of the company. Additionally, the amount in distributions appeared to be on a downward trend. He did take approximately $191,000 in 2013 compared to $151,000 in 2012, but Jeffrey returned $49,000 from the 2013 distributions to the company. He also testified credibly that he had to take some distributions in 2013 in order to comply with the temporary court order to pay approximately $14,500 each month for alimony, child support, and the family mortgage payment.

We do not believe we can reasonably expect Jeffrey to take distributions from the company before the parties' daughter reaches majority in mid-2016.[12] The company was anticipated to take a loss again in 2014. Jeffrey should not be required to drain the equity from his business to pay child support. If his business was experiencing an ongoing profit and its equity was not at risk, we

---

[12] In reaching this decision, we've considered the nature of the business. Jeffrey testified the business has a pipeline of upcoming work it has contracted to complete but has not yet started, and the projection of the 2014 loss is based on the upcoming work the company had already contracted to complete. Because the construction contracts are in place months or years before the work begins and can take over a year to be completed, we do not expect the company to become profitable much, if at all, before the parties' daughter reaches majority.

might reach a different result.[13] While we strive to serve the best interests of the child in child support cases, we do not think the parties' daughter will suffer any harm because the child support award is based on a gross monthly income of $15,400 without regard to Jeffrey's distributions from his subchapter S corporation.

### E. Attorney and Expert Witness Fees.

Susan maintains Jeffrey should have been ordered to pay $22,500 of the fees she incurred from her attorney and expert witness at the trial court level.

Before the dissolution decree was filed, Susan had paid approximately $70,000 in attorney fees and expert fees. At the time of the proceeding, she had an outstanding bill of approximately $45,000 remaining. The district court found "that it is reasonable for Jeff to pay one-half of the remaining attorney fees and expert fees owed . . ." However, the court then gave Jeff "credit for $15,000 of those fees and costs based upon Susan's use of $30,000 of marital assets that she took from the sale of the family home in 2008." We see no distinction between Susan's use of $30,000 in marital funds from Jeffrey's use of marital funds to pay his legal expenses.

"Iowa trial courts have considerable discretion in awarding attorney fees." *In re Marriage of Steele*, 502 N.W.2d 18, 22 (Iowa Ct. App. 1993). It is undisputed Susan used the $30,000 of marital assets she had set aside as part

---

[13] We acknowledge the Iowa Child Support Guidelines define "net monthly income" as meaning "gross monthly income less deductions." *See* Iowa R. Civ. P. 9.5. However, we note that undoubtedly $75,000 of any annual distributions will likely be paid to Susan as part of Jeffrey's property settlement obligation. Jeffrey may also choose to pay the interest accruing on the property award from distributions. Although we gave some consideration to the distributions in determining the spousal support, we ultimately determined Jeffrey's salary alone was sufficient to meet his spousal support obligation.

of the $70,000 of attorney and expert fees she had already paid. The district court then deducted one-half of the $30,000 again as part of the remaining total—giving Jeffrey credit twice. We conclude the decree should be modified to provide that Jeffrey pay $22,500 of Susan's remaining attorney and expert fees.

### F. Appellate Attorney Fees.

Both parties ask the court to award them appellate attorney fees. Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Although Susan was meritorious on appeal, we believe the property award and our modifications of the alimony award sufficiently equip Susan to pay her own attorney fees. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 438 (Iowa 1981). Additionally, after considering Jeffrey's need for appellate attorney fees and Susan's ability to pay, we decline to award Jeffrey appellate attorney fees.

## IV. Conclusion.

Because Susan needs time to update her skills and reenter the workforce, we award Susan a combination of rehabilitative and traditional spousal support. The rehabilitation award shall be in the amount of $5000 a month for two years. Because of the significant disparity in income and the unlikelihood Susan will ever be able to achieve the lifestyle the couple maintained during their thirty-two year marriage, after the two years of rehabilitative alimony, we award Susan

traditional spousal support in the amount of $3000 monthly until Susan reaches the age of sixty-seven, remarries, or one of the parties dies. We modify the district court's award of attorney fees to Susan to $22,500, and we decline to award either party appellate attorney fees. We affirm the dissolution decree as modified.

Costs of this appeal are assessed to Jeffrey.

**AFFIRMED AS MODIFIED.**