IN THE COURT OF APPEALS OF IOWA
No. 14-0972
Filed October 14, 2015

IN RE THE MARRIAGE OF ANN M. FURY
AND THOMAS R. FURY

Upon the Petition of
ANN M. FURY,
        Petitioner-Appellee,

And Concerning
THOMAS R. FURY,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Dubuque County, Monica L.

Ackley, Judge.


        Thomas R. Fury appeals the decree dissolving his marriage to Ann M.

Fury. **AFFIRMED AS MODIFIED.**


        Stephen W. Scott of Kintzinger Law Firm, P.C., Dubuque, for appellant.

        Francis J. Lange of Lange & Neuwoehner, Dubuque, for appellee.


        Considered by Doyle, P.J., Mullins, J., and Goodhue, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**GOODHUE, Senior Judge.**

Thomas R. Fury (Tom) appeals the decree dissolving his marriage to Ann M. Fury. Tom challenges the amount and the duration of the spousal support awarded to Ann. He also challenges the requirement that he provide life insurance to fund the spousal support in the event of his death. Finally, he challenges the division of the property made by the decree.

## I. Background Facts

Tom and Ann were married in 1975. Tom was fifty-seven and Ann turned fifty-six near the time of trial. They have had four children but lost two of them in the mid-1990s, causing extreme emotional turmoil to the parties and to the marriage and causing both of the parties serious depression. The depression resulted in Ann's work efforts becoming intermittent and unsettled and resulted in Tom throwing himself full-force into his work. Their problems were aggravated by financial disagreements and difficulties.

Tom has been a roofer most of his adult life, and in 2007, he and another experienced roofer formed a subchapter S corporation and went into the roofing business on their own under the name of Experienced Roofing (Roofing). A balance sheet prepared immediately prior to the trial, indicated Roofing only had a value of $4685. Roofing does not maintain an inventory. Charges are made and collected when a job is finished. There may be significant amounts of accounts receivable at any given time, but they are offset by accounts payable. Tom still owes his brother $7500 of his contribution to capital made when the corporation was first formed. The value of Roofing's other assets are substantially offset by other liabilities. Three old, high-mileage pickups were

given no value since they apparently had been fully depreciated, but they surely have some minimal value.

Tom and the co-owner, Craig, are equal shareholders in Roofing. It employs three others, but only one has been with the company for more than one year. Tom is in charge of estimating, bidding, and other bookwork. Craig is the on-site project manager. Tom testified that Craig was sixty-three years old and it was uncertain how long Craig could do the physical work roofing entails or how or whether he could be replaced. The business appears to have limited value absent Tom and Craig's involvement.

Pursuant to the recommendation of their tax advisor, Tom and Craig are paid only $550 per week as wages with all other withdrawals considered distributions out of the corporation. A 2012 tax return for Ann showed wages of $9810. Only 2011 income tax returns for Tom and the corporation were provided. The corporate return showed that Tom had a total withdrawal and wages of $68,500. No one contested that $68,500 is Tom's annual earning capacity. There was testimony that he also received $500 per month as rental for Roofing's place of business that he also occupied as his residence.

Although Ann had been excused from her employment by a doctor's order for the trial, she had full-time employment waiting at $13.62 per hour where she had been employed off and on for several years. Neither party suffered any physical disability that prohibited them from full-time work.

There is also a commercial building in Dubuque that Ann had purchased in 1988 for $50,500, with the intent to start a boutique. The upstairs has been remodeled and is rented for $500 per month, and the downstairs is stocked with

miscellaneous merchandise, but Ann has never operated the business on a full-time basis. Instead it has been operated only on a hit-and-miss basis. Ann had worked buying and selling antique, decorative, and boutique items on a part-time basis even before the boutique shop had been purchased. Ann presented no record of her mercantile operations and apparently has none. The purchase of the building was made by a real-estate contract that called for a $10,500 down payment and $334.48 per month. The contract has been paid off, and Tom testified that the down payment, outstanding balance, utilities, real estate taxes, and substantial improvements were made out of joint funds and his efforts. Ann testified that at least a part of the payment had been made by her father as a pre-death inheritance, but no records were provided. Because of a new loan there is indebtedness secured by the commercial building of about $22,000. The district court found that the Dubuque commercial property minus the indebtedness and Roofing to be of equal value and awarded Roofing to Tom and the commercial building to Ann.

In addition, the parties owned a residence and a condominium both in Dubuque and a timeshare in Florida. The decree transferred the residence to Tom but ordered it sold and the mortgage and selling costs to be paid with the net proceeds to be divided equally between the parties. The Florida timeshare was also to be sold with the net proceeds to be divided equally. Of the buildings, only the residence has any appreciable net value. Using the tax assessor's value, the residence had a net value of approximately $12,000.

Tom was awarded the contents of the residence, and Ann was awarded the condominium and its contents. She had been living in the condominium and

wanted to keep it. It was encumbered with a $207,000 loan. Valuation testimony varied widely. If Ann retained it, she was ordered to refinance and remove Tom's name within three months of the decree's entry. Ann thought the condominium had a value of $240,000, but the assessor had it valued at $162,200. It is highly likely the mortgage significantly exceeds its value.

A 1998 Ford van and a 2007 GMC Acadia with negligible equity were awarded to Ann along with numerous boutique and collectable items with no known value. Among these items was possible Marilyn Monroe paraphernalia that had been purchased reportedly at a cost of $10,800. At the time of trial, neither party knew where the items were or whether they were still in either's possession. Retirement assets of approximately $50,000 were divided equally between the parties. Tom's financial statement indicated there was approximately $15,000 of unsecured obligations.

After awarding the property as indicated and allocating the debts between them, the court made a calculation that Ann had received $7049 worth of property and Tom $23,596 worth of property. It then ordered Tom to pay an adjustment of $8200 to Ann to equalize the distribution.

The court specifically found that for a good portion of their marriage, Ann had been "a traditional stay-at-home mom" and that she would never be able to generate an income equal to Tom's earning capacity. Tom's experience is limited to roofing, but he obtained a business degree while the parties were married. It was paid for with marital funds. The court also found that Tom would have a better opportunity for job possibilities than Ann, even if his business should be lost because of Craig's inability to continue or for other reasons.

Accordingly, Ann was awarded $1500 per month as permanent support commencing January 1, 2014, to continue until the death of either Ann or Tom. In addition, Tom was ordered to maintain a life insurance policy on his life with Ann as the beneficiary sufficient to make a payment to her for $1500 per month for the rest of her life expectancy. The court calculated that amount initially to be $500,000, but indicated that it could be reduced as the payments were made and Ann's life expectancy decreased. There was no evidence of the cost of such a policy or its availability. Tom was ordered to pay $5000 of Ann's attorney fees.

## II. Error Preservation

Generally error has been preserved as to any issue raised and considered by the trial court. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Property division and spousal support, including the insurance guarantee, were a part of the court's ruling. As to those issues, error has been preserved.

## III. Scope of Review

Dissolution matters are reviewed de novo. Iowa R. App. P. 6.907; *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). We give weight to the factual findings of the district court but are not bound by them. Iowa R. App. P. 6.904(3)(g); *Gensley*, 777 N.W.2d at 713.

## IV. Discussion

Property division is based on each spouse's right to a just and equitable share of what has been accumulated during the marriage as a result of their joint efforts. *In re Marriage of Francis*, 442 N.W.2d 59, 62 (Iowa 1989).

In order to maintain an equitable division, the district court awarded each party fifty percent of each asset of significant value when reasonably possible.

The finding that Roofing and the commercial building—less the indebtedness if secured—were of equal value was not challenged by Tom. Ann wanted to keep the condominium, and she felt it could have a value of $240,000, which would leave it with a net value of $33,000. The court noted, however, that it was assessed at $162,100. Ann was made responsible for the entire indebtedness secured by the condominium.

Ann did not cross-appeal, but both Ann and Tom made computations showing how the court's calculation resulting in Tom owing Ann $8200 was inequitable as to their particular interests. Where valuations were given by a party's testimony they varied widely and there were multiple minor items for which no credible valuation was given. The variations permitted the parties to pick and choose which valuations to use and gave them the opportunity to come up with any result they wanted.

Tom particularly complains that the Marilyn Monroe memorabilia should have been sold and divided equally. The court, in its initial decree, ordered the items sold and the proceeds divided. In a posttrial motion, Ann asserted that the memorabilia had been a gift from her children. In its posttrial order, the court noted that the memorabilia had been gifted to Ann by her children and given to Ann. Ann's own testimony did not support that contention, and in fact, her testimony was that she had purchased the items. Furthermore, if the items are found and have value even approaching their cost, the equal division the district court otherwise achieved has been distorted. An item worth $10,870 is a significant marital asset to these parties.

Tom also complains that the Florida timeshare has a maintenance fee connected to it, and he wants it sold before any fee is incurred. He is afraid it will accrue prior to the sale of the timeshare and he will be obligated to pay it. The court ordered the timeshare to be sold in three months. What has happened since is unknown, but we assume and expect compliance with the court's order.

A trial court is given considerable latitude in the matter of property distribution, and it will not be nullified on appeal unless it failed to do equity based on the record made. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). Based on the record before us, we find no support upon which the district court could appropriately change the distribution of the Marilyn Monroe memorabilia in its original decree. Accordingly if the Marilyn Monroe memorabilia is ever found it should be sold and the proceeds divided. Otherwise, we cannot say the court failed to do equity in the property division it made and it is accordingly affirmed.

Tom objects that the award of spousal support is excessive and that Ann should have been awarded only rehabilitative support. The purpose of permanent support is to provide the recipient with funds in lieu of an obligation to support that person. *In re Marriage of Hellinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). Permanent support is based on need and ability to pay. *Id.* Where a spouse cannot afford to pay spousal support, none should be awarded. *In re Marriage of Woodward*, 426 N.W.2d 668, 670 (Iowa Ct. App. 1988). A long-term marriage where income disparity can be predicted with reliability is a situation where spousal support is generally appropriate. *Francis*, 442 N.W.2d at 62-63.

Given the historic disparity in the parties' income, their relative education levels, and the general needs and ability to pay, this is a situation where permanent support should be awarded. Tom's continued employment at its present level involves a measure of uncertainty, but spousal support awards are subject to modification if a substantial change occurs. *See* Iowa Code § 598.21C(1) (2011). When determining spousal support, each case must be considered based on its own circumstances and precedence is of little value. *In re Marriage of Sheckelberg,* 824 N.W.2d 481, 486 (Iowa 2012). An award of spousal support will be adjusted only where there has been a failure to achieve equity. *Id.* The award of traditional support in the amount of $1500 per month is equitable under the circumstances. There is nothing in the record to indicate Ann will be able to earn an income approaching Tom's earning capacity.

Tom also objects to the spousal support's duration. The district court required the monthly spousal support payments continue until one or the other dies, but then required Tom to carry life insurance adequate to guarantee the spousal-support payment for Ann's life expectancy. The question of how much spousal support is due upon retirement has recently been considered in depth by our supreme court. *See In re Marriage of Gust*, 858 N.W.2d 402 (Iowa 2015). *Gust* places particular reliance on a modification case that amended a spousal-support award based on a change in circumstances resulting from a retirement. 858 N.W.2d at 412-13 (citing *In re Marriage of Michael*, 839 N.W.2d 630, 638-39 (Iowa 2013)). After considering the various approaches the court could follow, the *Gust* court stated,

We think the best course in this case is to follow *In re Marriage of Michael*. Under this approach future retirement will ordinarily be considered to raise too many speculative issues to be considered in the initial spousal support award. In this case, as in *In re Marriage of Michael*, we simply do not know important facts.

*Id.* at 416.

In *Gust*, the spousal support was left to continue with any change to be made by modification at the time of retirement. *Id.* at 418. Ann considers *Gust* dispositive. As stated above, *Gust* is applicable to the facts present in that case and where important facts are simply not known. It did not foreclose other options when appropriate. There are important facts that are known in this case that make it a strong probability, if not a certainty, that if the spousal support is left at $1500 per month and the insurance requirement is left intact, there will be no retirement for Tom. Instead, he will be required to work in order to pay the spousal support and life-insurance premium as long as he and Ann both live. The important known facts are as follows: (1) Tom has no pension from an employer. (2) The parties' only retirement funds amounted to $50,000 and these funds have been evenly divided between them. (3) Tom's net income is less than $70,000 per year and there is little chance it will increase. (4) Tom was fifty-seven at the time of trial and Ann was fifty-six, which indicates that they can retire for social security purposes at approximately the same time. (5) After the dissolution, Tom has very limited assets. (6) Tom has little chance to increase his net worth or retirement funds given his age, earning capacity, and the obligations he has under this decree. (7) Tom's retirement income almost certainly will be primarily social security and he has been paying social security on wages of only $28,600 per year. If this continues his social security income

will be limited accordingly. Tom has some control over his social security contribution, but he and Craig would need to agree to a different course of action. An increase in wages would only be for the remaining years of his employment before retirement. (8) Ann has rental income of $500 per month, one half of the existing retirement funds of the parties, and a shop that could be rented or operated. That income would continue after her retirement. Tom's business has little value absent both his and Craig's involvement.

We believe the known information stated above dictates a reduction of Ann's spousal support when she reaches the age she can receive full benefits for social security purposes. At that time, Ann's spousal support should be reduced so that her spousal support will be equal to fifty percent of the difference between Ann's gross social security award and Tom's gross social security award. The intent is to equalize the social security benefits between the parties by adjusting the spousal support. The award attributable to Ann will be the greater of what she can receive from her own earning history or from Tom's. This formula assumes Tom's award will be greater than Ann's and that Ann does not remarry. In the event of either happening, Ann's spousal support will end when she reaches retirement age. Although both Tom and Ann may be required to work after retirement, it is not anticipated they will have substantial earned income. The formula will require an annual adjustment, but the formula should make the adjustment easily done. This result is consistent with other case holdings. *See, e.g., In re Marriage of McCurnin*, 681 N.W.2d 322, 326-31 (Iowa 2004); *Craft v. Craft*, 226 N.W.2d 6, 8-9 (Iowa 1975).

Ann has objected to usage of the social security implications since little direct evidence was submitted at trial, but when a subject is capable of ready and accurate verification that cannot reasonably be questioned, the court can take the judicial notice of those facts. Iowa R. Evid. 5.201(b)

The facts in *Gust* were such that the minority would have eliminated the support payable to the recipient at the payer's retirement. 858 N.W.2d at 421 (Wiggins, J., dissenting in part). The primary effect of the dissent would be to shift the burden of seeking modification upon retirement from one party to the other. Under the facts of this case, we do not believe it is appropriate to place an almost unavoidable requirement for modification on either party given the factors that exist at this time. Modifications are expensive. Finally, given the factors that are presently evident, it would be difficult to assert these facts were not anticipated at the entry of the decree. Such a showing is required to support a modification. *In re Marriage of Sisson*, 843 N.W.2d 866, 870-871 (Iowa 2014).

Under the present decree, it is quite possible and, in fact likely, that upon reaching retirement age for social security purposes, Tom will be paying over half of his social security to Ann and also paying a significant life-insurance premium. The amount of the insurance would decrease each year, but Tom would have to procure a policy that would guarantee coverage until he was eighty-four years of age. There is no evidence regarding what such a policy would cost in premium, but it surely would be substantial.

The amount of life insurance that Tom should be required to carry to cover naming Ann as a beneficiary should be reduced to an amount that would pay Ann $1500 per month until the date that she could retire and obtain full social

security benefits.  If Tom dies after his retirement and Ann does not remarry, the social security marital payment to Ann would continue.

The modification we are making to the decree does not necessarily eliminate the need of a future modification.  But it does reduce the certainty of a need to modify—or worse, a continuation of an inequity without possible recourse.  The ruling of the district court is affirmed with the modification as to the property division and change of spousal support and insurance benefits as set out above.  Ann's request for appellate attorney fees is denied.

Costs of the appeal are taxed equally to both parties.

**AFFIRMED AS MODIFIED.**