**IN THE COURT OF APPEALS OF IOWA**

No. 16-1114
Filed March 8, 2017

IN RE THE MARRIAGE OF AMANDA JO WILSON
AND RYAN EUGENE WILSON

Upon the Petition of
**AMANDA JO WILSON,**
        Petitioner-Appellant,

**And Concerning**
**RYAN EUGENE WILSON,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Poweshiek County, Lucy J.

Gamon, Judge.


        The mother appeals from the provisions of the district court's dissolution

decree concerning her three minor children and spousal support.  **AFFIRMED**

**AS MODIFIED.**


        John C. Wagner of John C. Wagner Law Offices, P.C., Amana, for

appellant.

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.


        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Amanda Wilson appeals from the provisions of the district court's dissolution decree concerning her three minor children and spousal support. Amanda challenges the court's placement of the parties' children in Ryan Wilson's physical care. She also challenges the denial of rehabilitative spousal support. We affirm as modified.

**I. Background Facts and Proceedings.**

Ryan and Amanda were married on January 26, 2006. At the time of trial, Ryan was thirty-seven years old and Amanda was thirty. They have three children born of the marriage: C.M.W., who was ten at the time of trial; C.R.W., who was eight; and C.J.W., who was six. Amanda has a child from another relationship who is not a part of this proceeding. On July 28, 2014, Amanda filed a petition for dissolution of marriage.

Prior to C.M.W.'s birth, Amanda worked at a retail establishment part-time. She was forced to end her employment after she was put on bed rest during her pregnancy with C.M.W. Following C.M.W.'s birth, Amanda worked as a stay-at-home parent for the majority of the marriage. She was responsible for the care of the children. Her role included keeping the children on a schedule, cleaning, feeding the children, taking the children on vacation, attending school conferences, and other child-rearing activities. Both parties acknowledge that Amanda was successful in her role. In 2012, Amanda helped start a non-profit organization where she eventually became a paid employee, but this role only lasted for two years. At the time of trial, she worked as a part-time substitute teacher in the Sigourney Community School District, where she now lives.

Ryan earned a technical degree and was subsequently hired as a lineman. In 2008, he achieved journeyman status. His job required long hours and frequent travel. It was not uncommon for him to travel for extended periods. Ryan's average earnings were approximately $104,000 annually. At the time of trial, however, Ryan was laid off from his employment. He declined to search for additional employment on the belief his employer would recall him. In the event his former employer did not recall him, Ryan testified that he could find new employment quickly. The district court imputed $90,000 of income for purposes of child support.

In July 2014, the parties' relationship took an abrupt turn. Amanda decided to move herself and the children with her friend, Brandon Cundiff,[1] to Pennsylvania without giving any notice to Ryan. Amanda claims Ryan's drinking problem forced her to move. She testified that Ryan would drink to the point of passing out on multiple occasions. Ryan disputes his drinking was so excessive. Following Amanda's move, Ryan obtained a temporary injunction requiring that the children be returned to live at the marital home in Brooklyn, Iowa, and attend school in their previous school district, BGM. Ryan then drove to Pennsylvania to pick up the children. The situation caused the children to miss the first day of school.

---

[1] The parties dispute the status of Amanda and Brandon's relationship at the time of the move. Amanda claims the relationship was platonic while Ryan claims they were romantically involved. At the time of trial, Brandon and Amanda were engaged and had a child together.

A temporary custody order entered on September 2, 2014,[2] awarded Ryan physical care of the three children. Ryan took a week off from work to ensure the children were adjusting to the new arrangement. Ryan also arranged the children's care during work hours and ensured help for the children to prepare for educational and extracurricular activities. According to testimony, the children were thriving under Ryan's physical care. On October 13, 2014, the court entered a temporary visitation order establishing visitation rights for Amanda, who remained in Pennsylvania.

On or around February 1, 2015, Amanda suffered from a mental-health issue that required a short hospital stay. Following the stay, she continued to seek treatment for depression. Subsequent medical reports indicated that she was "on a positive trajectory towards overall well-being" and did not require any medication as of March 2015.[3] These issues became the center of multiple visitation disputes. In a motion to compel dated June 19, 2015, Amanda claimed Ryan was denying visitation. Ryan claimed he was concerned about the children's well-being under Amanda's care, and he would comply with the visitation requests on the condition Amanda disclosed her medical records. In its June 24, 2015 ruling, the court ordered one week of visitation for Amanda and required Amanda to disclose her medical records through a release.

---

[2] The temporary custody order also denied temporary-visitation rights to Amanda until she moved back to Iowa or re-petitioned the court with a proposal specifying how the children would travel from Iowa to Pennsylvania.

[3] A letter from Amanda's physician assistant and counselor stated Amanda "does not pose a threat to herself or anyone else [as of August 20, 2015]" and "she has been on a positive trajectory towards overall well-being and her mood has been stable."

On September 1, 2015, after over a year in Pennsylvania, Amanda returned to Iowa with her current fiancé.[4] On September 14, 2015, the court modified the temporary order by increasing Amanda's visitation time with the children. Following the trial, the court awarded physical care to Ryan and denied Amanda's request for spousal support. The court also awarded an equalization payment from Ryan to Amanda for $30,005.76 payable at $1000 per month until paid in full, and Ryan must pay for $5000 of Amanda's attorney fees at $500 per month. Amanda appeals the physical care and spousal support provisions of the decree. Amanda also seeks appellate attorney fees.

**II. Standard of Review.**

We review cases tried in equity, such as dissolution cases, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012). We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Prior cases are of little precedential value, except to provide a framework for analysis, and we must ultimately tailor our decision to the unique facts and circumstances before us." *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995).

**III. Discussion.**

**a. Physical Care Determination.**

Amanda appeals the district court's decision placing C.M.W., C.R.W., and C.J.W. under Ryan's physical care. At trial, both parents requested physical

---

[4] Amanda was pregnant upon her return to Iowa. The child is not a part of these proceedings.

care.  Amanda requested joint physical care in the alternative.  "Physical care" involves "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child."  Iowa Code § 598.1(7) (2014).  "The parent awarded physical care maintains the primary residence and has the right to determine the myriad of details associated with routine living, including such things as what clothes the children wear, when they go to bed, with whom they associate or date, etc."  *In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007).  The fundamental goal in determining physical care of a child in an action for dissolution of marriage is to place the child in the care of the parent who will likely accommodate the long-range best interests of the child.  *In re Marriage of Winter*, 223 N.W.2d 165, 167 (Iowa 1974).  "[T]he basic framework for determining the best interest of the child" is well established.  *See* Iowa Code § 598.41; *Hansen*, 733 N.W.2d at 696.  Generally, stability and continuity of caregiving are important considerations.  *Hansen*, 733 N.W.2d at 696.  Finally, "[t]he objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity."  *Id.* at 695.

When physical care is at issue in marriage dissolution cases, the district court may grant the parents joint physical care or choose one parent to be the physical caregiver of the children.  *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007).  "The critical question in deciding whether joint physical care is . . . appropriate is whether the parties can communicate effectively on the myriad of issues that arise daily in the routine care of a child."  *Id.* at 580.  The court considers the following factors in determining whether to grant joint physical care:

(1) the historical care giving arrangement for the child between the parents, (2) the ability of the spouses to communicate and show mutual respect, (3) the degree of conflict between the spouses, and (4) the degree to which the parents are in general agreement about their approach to parenting. *Hansen*, 733 N.W.2d at 697–99; *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007). Not all factors are given equal consideration, and the weight of each factor depends on the facts and circumstances of each case. *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). The primary consideration for custody determinations is the best interests of the child. Iowa R. App. P. 6.904(3)(o).

*1. Joint Physical Care.* With the above in mind, we first determine whether joint physical care is in the best interest of the children. Amanda argues that joint physical care is proper because both parents are familiar with caregiving duties and the parties are able to communicate regarding parenting decisions. Amanda also maintains the parents agree about their parenting approach. Ryan contends joint physical care is not feasible due to the distance between the parties' homes.

Under the first *Hansen* factor, both parents have assumed physical caregiving duties at some point during the children's lives. Amanda was the physical caregiver for the majority of the time from each of the children's birth to 2014. During that time, she took care of the children's day-to-day needs while Ryan worked. Amanda testified that she kept the children on a schedule, took them to the park, did their laundry, cooked, and purchased groceries. She also attended extracurricular activities, school events, and doctor's appointments

while Ryan was traveling for work. Ryan became the physical care parent in 2014 after Amanda moved to Pennsylvania. At the time of trial, Ryan was unemployed and involved with the children's educational and extracurricular activities. When Ryan was working, he arranged for a third party to help with the children's day-to-day needs. Testimony from the children's teachers and multiple progress reports indicated the children were prepared and successful in school. Both Ryan and Amanda have demonstrated the ability to parent as the physical caregiver.

Under the second and third factors, the parties' conflict has led to challenging communications during the relationship. In fact, the district court stated, "This case is unusually contentious, even for a child custody proceeding." Amanda made multiple decisions regarding the children's wellbeing without consulting Ryan. In 2014, she took the kids to Pennsylvania without notifying Ryan. Upon her return to Iowa with a fiancé and child, she began religious activities with the children without discussing the decision with Ryan. On the other hand, Ryan removed the children from school and took them on an extended vacation without discussing the details of the trip, or its effect on the children's education, with Amanda. Amanda also testified that Ryan provided notice of the children's medical appointments only a few hours before the appointment time, which made it difficult for her to attend. However, when the children's schedule required flexibility, text communications illustrate Ryan and Amanda's ability to co-parent in an efficient and respectful manner. Both Ryan and Amanda were also flexible with each other regarding visitations, including an offer by Amanda to watch the children so Ryan would not have to miss work, and

multiple offers to adjust visitation schedules. While the record indicates the parties' communication was improving at the time of trial, there are still clear signs of tension that would be problematic in a joint-physical-care arrangement.

Under the final factor, the parties are in general agreement regarding their parenting approach. Both Ryan and Amanda strive for shared values that encourage the development, well-being, and growth of their children. These values include an organized routine, participation in school, participation in extracurricular activities, community, and a close relationship with the other parent.

With the above factors in mind, however, we believe joint physical care is not in the best interests of the children. Despite both parties' caregiving experience and a clear indication that the children are successful and well prepared under either parent's care, the strained communications and tension between the parents does not support a joint-physical-care arrangement. Furthermore, the physical distance between the parties' residences is unworkable. We cannot say it is in the best interest of the children to change or alternate school districts in order to accommodate a joint-physical-care arrangement. *See In re Marriage of Swenka*, 576 N.W.2d 615, 617 (Iowa Ct. App. 1998) ("An attempt to provide equal physical care may be harmful and disruptive by depriving children of a necessary sense of stability."); *see also In re Marriage of Metcalf*, No. 06-0324, 2006 WL 3018228, at *1 (Iowa Ct. App. Oct. 25, 2006) ("The current agreement of the parties-alternating weeks-is unworkable when the parties reside in two different school districts with approximately an hour drive in-between."). Even assuming the children remain in the BGM school

district, spending nearly ninety minutes per day in a car while they are under Amanda's care places unnecessary stress on the children.[5] The children are very active in sports, school, and other extracurricular activities. Ensuring the children are on schedule is difficult enough when the parties live in the same district, doing so from a town forty-five minutes away is not in their best interests.

**2. Physical Care.** Because joint physical care is unworkable under the present circumstance, we must determine which parent will be the physical caregiver. *Hansen*, 733 N.W.2d at 690–91. In determining which physical care arrangement is in the children's best interest, we consider the factors set forth in Iowa Code section 598.41(3). When a parent establishes a home with another adult, the new adult's background and relationship with the children is also an important factor to consider. *In re Marriage of Malloy*, 687 N.W.2d 110, 113 (Iowa Ct. App. 2004). Ultimately, our goal is to place the children in the environment most likely to bring them to healthy physical, mental and social maturity. *Hansen*, 733 N.W.2d at 696; *In re Marriage of Murphy*, 592 N.W.2d 681, 683 (Iowa 1999).

The district court determined, "Ryan is the parent in whose home the children are most likely to experience the structure and stability upon which their future success depends." The district court reasoned the children are settled in their current home and school district under Ryan's care and Amanda's instability is not in the children's best interest. We agree.

---

[5] Amanda testified that she would move closer to the children if awarded joint physical care in order to accommodate their needs. We decline to speculate what the best interests of the children will be based on a hypothetical event. *See In re Marriage of Thielges*, 623 N.W.2d 232, 237–38 (Iowa Ct. App. 2000).

Amanda argues Ryan's drinking problem creates an unstable environment for the children precluding him from assuming the physical caregiver role. The record does reflect troubling incidents caused by Ryan's alcohol consumption prior to the parties' separation. On multiple occasions, he drank to excess. Ryan testified that he has not had an alcoholic drink since July 2014. Amanda disputes this claim. We agree with the district court that Ryan's drinking has ceased or substantially decreased since taking over the physical caregiving duties. At the time of trial, issues related to alcohol do not appear to affect his parenting. The children are progressing well in school and testimony indicates that the household is clean and organized.

The record also reflects troubling incidents related to Amanda's move in July 2014 to Pennsylvania. Without any notice to Ryan, she took the children to Pennsylvania. Ryan was required to seek a temporary injunction from the court after Amanda refused to bring the children back to Iowa. The children returned to Iowa only when Ryan travelled to pick them up in Pennsylvania. Amanda later acknowledged that her decision was misguided, and she testified that mental-health issues contributed to her actions. As of the trial date, doctor's reports reveal that Amanda has recovered from any mental-health issues she was suffering from at the time.

Despite Ryan and Amanda's shortcomings, both have proven to be good parents. Furthermore, there is no indication that Brandon, the mother's fiancé, would inhibit the children's growth under Amanda's care. The record indicates that Brandon's relationship with the children is positive and the children are bonded with their new half sibling. The significant distinction between Ryan and

Amanda's physical care arrangement is the children's current familiarity with the schools, teachers, friends, and community in Brooklyn, Iowa. Uprooting the children by placing them in Amanda's care would disturb the children's already stable environment, in which they are thriving. Under Ryan's care, the children are established in their school. They have relationships with teachers, friends, and other caregivers. They enjoy a wide variety of extracurricular activities. Considering the best interests of the children, we agree with the district court, Ryan will provide the physical care that is most likely to bring them to healthy physical, mental, and social maturity. *See Murphy*, 592 N.W.2d at 683.

**3. *Visitation.*** Amanda argues the court should have awarded four weeks of summer visitation instead of three. The record indicates that the parties agreed to four weeks of summer visitation, not three. Ryan does not contest this on appeal. Consequently, we modify the decree to include four weeks of summer visitation to Amanda.

**b. Spousal Support.**

Amanda appeals the provisions of the decree denying her spousal support. She argues she is entitled to rehabilitative alimony to compensate her for the periods she was out of the workforce caring for the children while Ryan advanced his career. Ryan argues an alimony award is improper because Amanda's fiancé supports her and Amanda failed to gain full-time employment or enroll in classes since she returned to Iowa.

Spousal support is not an absolute right; an award depends on the facts and circumstances of the case. *Schenkelberg*, 824 N.W.2d at 486. Iowa Code section 598.21A(1) provides the relevant factors in considering whether spousal

support is appropriate, including (1) the length of marriage; (2) the age and emotional and physical health of the parties; (3) the property distribution; (4) the educational level of the parties at the time of marriage and when the dissolution action is commenced; (5) the earning capacity of the party seeking alimony, including educational background, training, employment skills, work experience, and length of absence from the job market; and (6) the feasibility of the alimony-seeking party to become self-supporting with a reasonably comparable standard of living to that enjoyed during the marriage. *See also Hansen*, 733 N.W.2d at 704.

Iowa law recognizes three forms of alimony: traditional, rehabilitative, and reimbursement. *In re Marriage of Probasco*, 676 N.W.2d 179, 184 (Iowa 2004). We are not required to award any one type of alimony and our focus is whether the award is warranted based on the above listed factors, rather than the specific category of spousal support. *See In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008) ("[T]here is nothing in our case law that requires us, or any other court in this state, to award only one type of support."). Rehabilitative alimony has a distinctive purpose as it is recognized in Iowa. *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005). Rehabilitative alimony was "conceived as a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." *Id.* at 540–41 (citing *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989)).

Amanda has limited experience in the workplace, a large disparity in income compared to Ryan's, and no post-secondary education degrees. In

2006, she worked part-time at a retail establishment until she was put on bed rest while she was pregnant with their first child. Although she did some in-home day care, Amanda worked almost exclusively as a stay-at-home parent until she started a non-profit entity in 2013. She made little the first year, but in 2014, her income peaked when she earned $19,085 working for the non-profit. She no longer works with the non-profit entity. At trial, she testified she earns approximately $8.90 per hour as a part-time substitute in the Sigourney Community School District. In contrast, Ryan earned a technical degree and became a journeyman lineman in 2008. Ryan's career advancement—at least partially—was made possible by Amanda's support at home. Although Ryan was on layoff from his employer at the time of trial, he expected to be rehired or obtain new employment in the near future.

Generally, a large discrepancy in income, an extended absence from the workforce, and a need for additional education are facts supporting rehabilitative alimony. *See In re Marriage of Smith*, 573 N.W.2d 924, 927 (Iowa 1998) ("Compared with [the father's] abilities and needs, [the mother's] limited educational background, lack of employment security and responsibility in taking over the marital home were not—without alimony—sufficient for her subsistence."); *see also In re Marriage of Rothfus,* No. 13-1745, 2014 WL 2885340, at *1 (Iowa Ct. App. June 25, 2014). In *Rothfus*, for example, the mother obtained some college credits and earned approximately $22,000 per year during the marriage. 2014 WL 2885340, at *1. The parties were married for ten years, and the mother stayed home for eight years while the father advanced his career as a lineman earning approximately $68,000 per year. *Id.* at *4–5. A

panel of our court modified the district court's denial of spousal support and held the mother was entitled to rehabilitative support for $1000 per month for a four-year period to help her attain self-sufficiency. *Id.* at *6.

For similar reasons we believe Amanda is entitled to a limited period of spousal support. In making our determination, we are guided by the goal of rehabilitative alimony—allowing the recipient to achieve self-sufficiency. *See Smith*, 573 N.W.2d at 926; *Francis*, 442 N.W.2d at 63. During the marriage, Amanda was removed from the workforce while she raised three children. Her employment was limited to one short-lived job and part-time retail experience. It is likely she would need additional education, training, and employment in order to become self-sufficient. She has taken steps to enroll in classes in order to complete her degree.

We are not convinced by Ryan's argument that an award of spousal support is precluded because her "[fiancé] provide[s] for all Amanda's needs." At the same time, Ryan complains that Amanda is delinquent on child support. Our courts have acknowledged that remarriage and cohabitation is not always an appropriate triggering event for the termination of alimony because its purpose is to establish self-sufficiency for the dependent spouse. *See In re Marriage of Wendell*, 581 N.W.2d 197, 200 (Iowa Ct. App. 1998) ("Generally, whether remarriage terminates alimony depends, primarily, on the purpose behind the award of alimony. Rehabilitative and reimbursement alimony, for example, are often unaffected by remarriage."); *see also Francis*, 442 N.W.2d at 64 ("'Reimbursement' alimony . . . which is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning

capacity of the other, should not be subject to modification or termination until full compensation is achieved."); *In re Marriage of Ales*, 592 N.W.2d 698, 704 (Iowa Ct. App. 1999) ("[R]ehabilitative and reimbursement alimony are the types of alimony we most often allow to continue after a recipient spouse's remarriage."). We believe the same rationale applies to the award of alimony where the dependent spouse is receiving support from a cohabitant at the time of dissolution. The purpose of spousal support in this situation is to help Amanda attain self-sufficiency based on the discrepancy between the parties' current incomes and the support Amanda provided to advance Ryan's career. Amanda's present reliance on Brandon does not change the support she gave to Ryan during her marriage or her need for self-sufficiency. The instability associated with cohabitation also supports a spousal award even when the cohabitant is providing for the dependent spouse. While Brandon did testify that he financially supports Amanda, the extent of Brandon's support can change at any time. The parties have no immediate plans to marry, Brandon's income fluctuates, and he has support obligations from other marriages, on one of which he is not current. Amanda's need to attain self-sufficiency is outweighed by any temporary support provided by her cohabitant.

In constructing the support award, we rely on Amanda's contribution to Ryan's increased earning potential compared to Amanda's earning potential. *Francis*, 442 N.W.2d at 61; s*ee also* Iowa Code § 598.21A(1). We agree with the district court that Ryan has the potential to earn approximately $90,000 per year. Ryan's earning capacity is largely attributable to his journeyman status, which Amanda made possible by her support at home. While we acknowledge that

Ryan is already paying $1500 a month to Amanda for property settlement and attorney fees, his earning potential indicates he can afford to pay spousal support for a limited period of time. Therefore, a spousal-support award of $1000 per month for four years is equitable in this situation. The limited award is sufficient to provide Amanda with the education and employment experience necessary to attain self-sufficiency.

### c. Appellate Attorney Fees.

Amanda asks the court to award her appellate attorney fees. Appellate attorney fees are not a matter of right but rather rest in this court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Under these circumstances, we award Amanda $2000 in appellate attorney fees.

## IV. Conclusion.

After a careful review of the record, we hold it is in the children's best interest to remain under Ryan's physical care. The children are settled into their current school district and home. We believe the tension between the parties is too strained and the logistical difficulties posed by their geographical separation are too great to maintain a joint-physical-care arrangement that would benefit the children. We reverse the provisions of the order related to spousal support and modify it to include $1000 per month for four years in rehabilitative spousal support. We grant Amanda $2000 in appellate attorney fees.

**AFFIRMED AS MODIFIED.**